BOSTON EDISON COMPANY *vs.* BOARD OF ASSESSORS
OF WATERTOWN.

Suffolk.   May 6, 1982. — August 27, 1982.

Present: HENNESSEY, C.J., WILKINS, NOLAN, LYNCH, & O'CONNOR, JJ.

*Taxation,* Personal property tax:   value, public utility.

In a proceeding to determine the fair cash value of a utility's taxable per-
sonal property in Watertown consisting of switch gear, cable, trans-
formers, and other related equipment, substantial evidence did not
support the Appellate Tax Board's decision to grant almost complete
weight to the depreciated reproduction cost of the utility's personal
property, with only minimum weight given to the net book cost, or
rate base value, of the property.   [302-308]

APPEAL from a decision of the Appellate Tax Board.

*George M. Moriarty (Jeffrey B. Storer* with him) for the
plaintiff.

*Edward G. Seferian* for the defendant.

The following submitted briefs:

*Richard L. Brickley,* for Bay State Gas Company & an-
other, amici curiae.

*Philip H. R. Cahill,* for Massachusetts Electric Company
& another, amici curiae.

*Robert V. Cauchon,* for Eastern Edison Company, amicus
curiae.

*Robert S. Cummings & Duncan S. Payne,* for Holyoke
Power & Electric Company & another, amici curiae.

*Gerald V. May,* for Cambridge Electric Light Company
& others, amici curiae.

*Robert J. McGee,* for Colonial Gas Company, amicus
curiae.

*Verne W. Vance, Jr.,* for Boston Gas Company, amicus
curiae.

Boston Edison Co. v. Board of Assessors of Watertown.

*Richard J. Kelliher,* for Massachusetts Municipal Association, amicus curiae.

*Stanley U. Robinson, III,* amicus curiae.

WILKINS, J. Boston Edison Company (Edison) appeals from a decision of the Appellate Tax Board (board) valuing Edison's taxable personal property in Watertown for the fiscal years 1976, 1977, and 1978. Edison's principal challenge is to the board's determination to value Edison's property almost entirely on the basis of the property's depreciated reproduction cost, with only minimum weight given to the net book cost, or rate base value, of the property. The difference between the property's depreciated reproduction cost and its net book cost was substantial in each year. For example, the board found that, on January 1, 1976, the depreciated reproduction cost of Edison's property was approximately $15,600,000, and the net book cost was approximately $8,300,000. The board, for each year, gave 95% weight to the depreciated reproduction cost and 5% weight to the net book cost. Thus, for January 1, 1976, it arrived at a fair market value of approximately $15,230,000. The board granted partial abatements to Edison, and Edison has appealed. We conclude that the board's decision does not support its conclusion to give almost controlling weight to the depreciated reproduction cost method of valuing Edison's taxable personal property in Watertown, and we remand the proceedings to the board for further consideration.[1]

1. There are certain undisputed facts bearing on the question of the fair cash value of Edison's taxable personal property. Edison engages in the transmission and distribution of electricity for sale to customers in Watertown and in other municipalities in eastern Massachusetts. About 2½% of Edison's customers in Massachusetts are in Watertown. Edison's taxable personal property in Watertown consisted of

---

[1] We also consider Edison's challenges to (a) the reliability of certain testimony of an expert who testified on behalf of the assessors and (b) the board's determination of the percentage by which the Watertown assessors disproportionately assessed property in the town.

switch-gear and other related equipment in four electrical distribution substations; more than five miles of cable contained in underground conduits; and poles, wires, line transformers, street lights, lines running to customers' premises, and electric meters. The parties agreed before the board to a description of the relevant property. Although there were differences between the parties as to both the depreciated reproduction cost and the net book cost of this property, for the purposes of our decision on the major point in contention, we need not be concerned with those differences.[2]

The parties and the board also agree on certain principles which are applicable to this case. There was no reasonable basis for valuing the property by considering sales of comparable property. This is special purpose property as to which there were no comparable sales. Nor could there be any valuation of the property based on a capitalization of income. It was not feasible to allocate a portion of Edison's over-all revenue and expenses to Edison's Watertown property. It is for these reasons that the expert for each party used both the depreciated reproduction cost and the net book cost of the property in arriving at his opinion of fair cash value. The depreciated reproduction cost approach involves, for each item of property, a determination of its value based on the current cost of reproducing it, reduced by physical, functional, and economic depreciation.[3] The

---

[2] For example, as to January 1, 1976, values, the parties' evidence and the board's findings were as follows:

|            | Net Book Cost | Depreciated Reproduction Cost | Fair Market Value |
|------------|---------------|-------------------------------|-------------------|
| Edison     | $8,328,861    | $13,277,000                   | $ 8,500,000       |
| Assessors  | $8,171,300    | $16,365,000                   | $15,955,300       |
| Board      | $8,328,861    | $15,593,000                   | $15,229,793       |

[3] In some instances, it would not be reasonable to duplicate particular property and, instead of reproduction cost, one would substitute "replacement" cost, that is, the current cost of a modern equivalent in function and capacity. "Replacement" cost was not a significant factor in the evidence before the board.

net book cost, or the rate base value, of property is its cost when first devoted to public use, reduced by accrued depreciation. For property of the character involved in this case, the Department of Public Utilities allowed annual depreciation of 3% of its original cost. Edison's rates, as approved by the Department of Public Utilities, include an intended rate of return limited to a percentage of the "net book cost" of its property.[4]

Of particular significance to this case is the apparently longstanding position of the Department of Public Utilities that, if a regulated utility sells an asset to another regulated, public utility, the basis of that asset in the hands of the transferee remains the same as that of the transferor for rate-making purposes. Thus, if Edison were to sell any of its taxable personal property in Watertown to another public utility, that other utility would be allowed a return on the transferred property based on that property's net book, or rate base, value, and not on any higher purchase price it might have paid.

The basic principles of law applicable to this proceeding are not in dispute. The assessors must assess Edison's property at its "fair cash value" (G. L. c. 59, § 38), which means its fair market value. *Boston Gas Co.* v. *Assessors of Boston,* 334 Mass. 549, 566 (1956). Fair market value means "the price that an owner willing but not compelled to sell ought to receive from one willing but not compelled to buy." *Assessors of Quincy* v. *Boston Consol. Gas Co.,* 309 Mass. 60, 63 (1941). Where the property is such that its value cannot readily be determined by comparable sales or by capitalization of income, resort to the property's depreciated reproduction cost is particularly appropriate. *Foxboro Assocs.* v. *Assessors of Foxborough,* 385 Mass. 679, 687 (1982). *Correia* v. *New Bedford Redevelopment Auth.,* 375 Mass. 360, 362-364 (1978). *Commonwealth* v. *Massachusetts Turnpike*

---

[4] It seems accepted that during the period in question the Department of Public Utilities allowed Edison an annual return of 9½% on the net book cost of its property.

*Auth.*, 352 Mass. 143, 147-148 (1967). *Newton Girl Scout Council, Inc.* v. *Massachusetts Turnpike Auth.*, 335 Mass. 189, 194-195 (1956). In valuing Edison's taxable personal property, a variety of factors may appropriately be considered. "[T]he value of [the] property for any special purpose together with its value for all purposes for which it is reasonably adapted may be shown." *Boston Gas Co.* v. *Assessors of Boston, supra* at 566. "Original cost with deductions, if any, for depreciation, replacement cost and productive power are all legitimate elements bearing upon true value, but no one of them is decisive." *Assessors of Quincy* v. *Boston Consol. Gas Co., supra* at 66-67, quoting from *Essex Co.* v. *Lawrence*, 214 Mass. 79, 89 (1913).

The board's decision must be supported by substantial evidence considering the entire record before the board. See *New Boston Garden Corp.* v. *Assessors of Boston*, 383 Mass. 456, 465-466 (1981). Where there is substantial evidence to support the board's decision, we defer to the board's judgment as to what evidence to accept and which method or methods of valuation to rely on. See *Foxboro Assocs.* v. *Assessors of Foxborough, supra* at 690; *Assessors of Quincy* v. *Boston Consol. Gas Co., supra* at 72. The principal issue before us, therefore, is whether, in determining the fair cash value of the property, the board's decision to grant almost complete weight to the depreciated reproduction cost of Edison's property is supported on the record. Here, it becomes necessary to describe the reasoning of the board.

The board rejected Edison's argument that, because the net book cost (rate base value) of its property limits its earnings, the net book cost of the property sets a ceiling on its value for local taxation purposes. We agree with the board that the net book cost of the property does not set an upper limit on the property's value for local taxation purposes. The argument that net book cost must be a ceiling on valuation has largely been rejected elsewhere.[5] The contention

---

[5] See, e.g., *New Haven Water Co.* v. *Board of Tax Review of New Haven*, 166 Conn. 232, 238-239 (1974); *Maine Consol. Power Co.* v.

particularly lacks merit if the buyer's earnings are not limited to a return based on the seller's rate base value.[6] This is because the value of property to a seller is not necessarily the true measure of fair market value. See *Boston Gas Co.* v. *Assessors of Boston, supra* at 566.

Even where a buyer may be restricted to a return on the net book cost of the seller, as we shall show subsequently, the net book cost is not a ceiling on fair market value. Although Edison argues that the net book cost should be an absolute limit on the fair cash value of its property, its own expert did not testify to that effect. The major thrust of Edison's argument is that the board did not give sufficient weight to the net book cost of its property, not that it had to give total weight to net book cost.

The board pointed out, quite correctly, that the value of property for rate-making purposes, related, as it is, to assuring provision for an adequate return on a utility's investment, may have little to do with what the property would sell for on a free and open market. The original cost of property, reduced by a fixed annual rate of depreciation, hardly is a guaranteed measure of the fair market value of

---

*Farmington*, 219 A.2d 748, 751 (Maine 1966); *Consumers Power Co.* v. *Port Sheldon Township*, 91 Mich. App. 180, 187-188 (1979) (relying in part on a legislative declaration that the value of property for rate-making purposes is not controlling evidence of true cash value for assessment purposes); *Independent School Dist. No. 99* v. *Commissioner of Taxation*, 297 Minn. 378, 384 (1973); *Public Serv. Co.* v. *Ashland*, 117 N.H. 635, 638 (1977); *Barnet* v. *New England Power Co.*, 130 Vt. 407, 413 (1972). These opinions recognize that original cost less depreciation is a factor to be considered along with others.

[6] See, e.g., *Northern Natural Gas Co.* v. *Dwyer*, 208 Kan. 337, 357 (1971), appeal dismissed and cert. denied sub nom. *Northern Natural Gas Co.* v. *Williams*, 406 U.S. 964, 967 (1972) (rate maker can change allowable rate base, depreciation rate, and rate of return); *Consumers Power Co.* v. *Big Prairie Township*, 81 Mich. App. 120, 132-133 (1978) (aside from regulated public utilities, the taxpayer's electric generating facility could have been purchased by unregulated municipal power companies and large industrial concerns with high electric power demands); *Independent School Dist. No. 99* v. *Commissioner of Taxation, supra* at 385 (utility rates were only partially regulated; owner paid more for the property than net book value).

that property. We agree with the board's statement, as a general proposition, that using depreciated reproduction cost is a more appropriate approach to valuing special purpose property of the character involved in this case than is the net book cost of that property. This is so, in part, because the depreciated reproduction cost method focuses more specifically on the property involved. Thus, in general terms, we would accept the board's conclusion that the assessors' expert, relying substantially on depreciated reproduction cost, was "more precise, objective and convincing," but for the fact that the board did not indicate where there was (a) substantial evidence on this record or (b) a reasonable basis in logic for ignoring almost entirely the fact that a potential buyer, if it were a public utility, would be considerably influenced by the return to which it would be limited on whatever investment it made. If property is known to be subject to a deed restriction or to a governmentally-imposed restriction affecting its value or its earning power, that fact should be considered in any determination of its fair cash value. *Mashpee Wampanoag Indian Tribal Council, Inc.* v. *Assessors of Mashpee,* 379 Mass. 420, 421-422 (1980) (deed restriction). *Community Dev. Co.* v. *Assessors of Gardner,* 377 Mass. 351, 354-355 (1979) (Federal regulations restricted the level of rents). See *New Haven Water Co.* v. *Board of Tax Review of New Haven,* 166 Conn. 232, 238 (1974).[7]

Although the board acknowledges that a public utility buyer of Edison's property would be limited to a fair return on Edison's net book cost, it nowhere explains, by reference

---

[7] In the *New Haven Water Co.* case, the State regulatory commission limited the earning capacity of the taxpayer's property to a fixed percentage of original cost less depreciation. "The price that a buyer would pay would depend [in part] on the exact rate of return allowed by the commission and the nature of alternative investment possibilities." *Id.* The committee determining the fair market value of the taxpayer's property recognized the possible effect of the restrictive aspect of the commission's limitation of return but concluded that the taxpayer had failed to demonstrate the effect of the restriction on value. *Id.* at 240. The court on appeal upheld exclusive reliance on depreciated reproduction cost.

to substantial evidence or to reasoned principle, why a buyer would want to pay more than Edison's net book value, when by investing the same dollars elsewhere that buyer could obtain a better return.[8]  One must remember that whatever valuation method is used, the goal is to determine what a willing buyer would pay a willing seller for the property.  We see no reason why a willing buyer would pay $15,229,793 (the board's determination of fair cash value in 1976) to purchase property on which it would expect to obtain an annual return of approximately $790,000 or about 5.2% (9½% of $8,328,861 [Edison's net book cost]).[9]

Even if a buyer is to be limited to a return on the seller's carry-over rate base, circumstances might induce a buyer to pay more than the rate base value of the property.  (a) The

---

[8] There is, however, authority noting the significance of the effect on fair market value of a regulated return on original cost less depreciation. See *Pacific Power & Light Co.* v. *Department of Revenue*, 286 Or. 529, 534-535 (1979).  Where a taxing authority used net book cost to value property, and no party advocated an alternate method of valuation, that method of valuation was accepted, assuming the recognition of a proper factor for depreciation.  See *Texas E. Transmission Corp.* v. *Carteret*, 116 N.J. Super. 9 (1970), and *Transcontinental Gas Pipe Line Corp.* v. *Bernards*, 115 N.J. Super. 593 (1970), both aff'd, 58 N.J. 585 (1971) (per curiam).  By a New Jersey statute, which did not apply to the property involved in those opinions, a municipality is directed to assess buildings of a public utility "in the manner provided by law for the taxation of similar property owned by other corporations or individuals."  N.J. Stat. Ann. § 54:30A-52 (West 1960).  Under this statute, a valuation based on a form of depreciated reproduction cost has been said to be correct.  *Public Serv. Elec. & Gas Co.* v. *Woodbridge*, 139 N.J. Super. 1, 21 (1976), modified on other grounds, 73 N.J. 474 (1977).

We note that other courts have upheld reliance on the depreciated reproduction cost method of valuing, for property tax purposes, the personal property of regulated utilities subject to rate base carry-over.  See, e.g., *New Haven Water Co.* v. *Board of Tax Review of New Haven*, *supra* (upholding exclusive reliance on depreciated reproduction cost where the taxpayer failed to demonstrate the effect of the rate restriction on value); *Northern Natural Gas Co.* v. *Dwyer*, *supra* (85% reliance on depreciated reproduction cost upheld).

[9] Although the assessors' expert would not acknowledge it, an investor could have done better by placing his money in a savings bank.  And, of course, it is common knowledge that even a better return could have been made in other secure investments.

return actually being earned by the utility may exceed or be expected to exceed the rate of return approved in the allowed rate, thus tending to encourage a buyer to pay more than the rate base. Also, the return allowed on the investment may exceed the return available in the market for an investment having the same or a greater risk.[10] (b) There is the possibility that the applicable rules of law or governing agency decisions might be changed so as to make an investment in the company more attractive. See *Northern Natural Gas Co.* v. *Dwyer*, 208 Kan. 337, 357 (1971), appeal dismissed and cert. denied sub nom. *Northern Natural Gas Co.* v. *Williams*, 406 U.S. 964, 967 (1972). To be worthy of consideration the prospect of any change must be a reasonable one. See *Roach* v. *Newton Redevelopment Auth.*, 381 Mass. 135, 136 (1980). There is no suggestion in this record that the carry-over rate base principle had been or was likely to be abandoned. There may be, however, some support for the idea that the rate of return allowed to the company reasonably could be expected to increase. (c) The potential for growth in a utility's business may warrant a buyer paying more than the utility's net book cost of particular property.

A further appropriate consideration may be the possibility of finding a buyer that is not a public utility. Some of the personal property (but presumably not installed underground cable, poles, and wires) may have a value in a market in which some potential buyers are not regulated utilities. Also, it could be that a municipality would consider forming a municipal light plant and would be willing to acquire the property for more than net book cost.

Our discussion of the possibilities for justifying a fair market value in excess of Edison's net book cost is not intended to be exhaustive. As long as the standard to be applied is fair cash value, however, the record must show why a willing buyer would reasonably be expected to pay the value

---

[10] There is no evidence in this record to warrant such conclusions in this case. In fact, evidence indicated that the company had earned less than the approved rate of return.

placed on the property by the board. The record in this case does not do so. The proceedings must be remanded to the board for a redetermination of the fair cash value of Edison's personal property in Watertown.

We recognize that the true contestants in this case are not Edison and the town of Watertown. The battle, in large measure, is between the interests of local taxpayers and consumers of electricity. If Edison pays more in local property taxes, that amount is reflected in Edison's rate to its customers, and other local taxpayers pay less. The lower Edison's local taxes, the lower its rates to its customers and the higher the local tax burden on other taxpayers (assuming no fiscal restraint on the local taxes).[11] It may be that, without running afoul of constitutional restrictions, the Legislature could prescribe a means of determining the value for taxation purposes of personal property of a utility that did not involve consideration of the net book cost of that property. However that may be, we remand the proceedings to the board for a redetermination of the fair cash value of Edison's taxable personal property in Watertown.

2. Edison challenges the opinion of fair cash value offered by the assessors' expert witness. This challenge does not rest on a claim that he was not qualified as an expert, but rather on the ground that his opinions were based on "erroneous foundations." However, the board did not fully accept the conclusions of the assessors' expert. It accepted Edison's evidence as to the net book value of its Watertown property and arrived at a depreciated reproduction cost below that testified to by the assessors' expert (see note 2 above). In general, the weight to be given to opinion evidence, not shown to be based on legally incompetent foundations, is for the board. See *Foxboro Assocs.* v. *Assessors of Foxborough*, 385 Mass. 679, 690 (1982); *Assessors of Lynnfield* v. *New England Oyster House, Inc.*, 362 Mass. 696,

---

[11] The contest is not exclusively between consumers of electricity and local taxpayers. We recognize that there is competition among suppliers of various forms of energy and, at least in theory, the higher Edison's rates the less competitive it will be.

702 (1972); *Boston Gas Co.* v. *Assessors of Boston,* 334 Mass. 549, 578-579 (1956). There may be situations, of course, in which an expert's testimony is so lacking in rational support that it has no probative force. See *New Boston Garden Corp.* v. *Assessors of Boston,* 383 Mass. 456, 468, 474-475 (1981); *Commonwealth* v. *Massachusetts Turnpike Auth.,* 352 Mass. 143, 149 (1967).

We do not know what the board will decide after this proceeding is remanded to it. It should consider Edison's criticisms of the opinions expressed by the assessors' expert. We do not, however, regard the opinions of the assessors' expert as wholly incompetent. The weight to be given to his testimony is for the board's determination.

3. Edison challenges the board's determination of the percentage of fair market value at which property in Watertown was assessed. The town conceded that it did not assess its property at 100% of fair cash value. The only evidence on disproportionate assessment which the board accepted showed that residential property was assessed at 16.6% of its fair cash value as of January 1, 1975; 15.9% as of January 1, 1976; and 15% as of January 1, 1977. The board found that "residential property" was the lowest substantial class of property and "rounded off" the percentages to 17% for each year.[12]

The need for any "rounding off" is unclear on this record. Certainly, 15% does not "round off" to 17%, nor does 15.9%. In the absence of some rational explanation, the board should use the percentages which it accepted as correct. The fact that there may be some margin for error in the percentages does not warrant increasing them, in the absence of evidence tending to show that the percentages were too low rather than too high.

4. We remand the proceedings to the Appellate Tax Board for further consideration in light of this opinion.

*So ordered.*

---

[12] The use of the disproportionate assessment ratio for residential property was correct for the tax years involved in this proceeding. *Tregor* v. *Assessors of Boston,* 377 Mass. 602, 604, cert. denied, 444 U.S. 841 (1979).