**MONTAUP ELECTRIC COMPANY**
**vs.**
**BOARD OF ASSESSORS OF**
**THE TOWN OF WHITMAN**

**Nos. 106363, 112461, 113819**

Appellate Tax Board
Commonwealth of Massachusetts

**December 16, 1982**

**Robert T. Capeless, Esq.,** for the appellant.
**Robert J. Cotter, Esq.,** for the appellee.

These are three appeals under the formal procedure pursuant to G.L. c. 59, ss. 64, 65 from the refusal of the appellee to abate taxes assessed to the appellant on certain of its personal property in the Town of Whitman for fiscal years 1979, 1980 and 1981.

These findings of fact and report are made pursuant to requests by the appellant and the appellee under G.L. c. 58A, s. 13 and Rule 32 of the Rules of Practice and Procedure of the Appellate Tax Board.

**FINDINGS OF FACT AND REPORT**

The appellant, Montaup Electric Company (Montaup), is an electric utility company engaged in buying and distributing electricity, stepping down the voltage and transmitting and selling it to other electric companies but mainly to two companies affiliated with it, namely, Eastern Edison Company and Blackstone Valley Electric Company.

The property involved here is at ". . . the junction of the transmission line from the Cape to Boston Edison Company. Primarily, it is a substation in that area to serve or give more stability to the Brockton/Whitman area." It is a central

point for distributing electricity coming from Boston or the Cape area. It consists of an electrical switching substation on Auburn Street, Whitman for 115,000 volt service, including a 345 K.V. transformer that steps down the voltage to 115 K.V. status, steel towers, circuit breakers, switches, cables, etc., all as listed on a Form of List filed with the appellee pursuant to G.L. c. 59, s. 29 (Exhibit 1). Originally erected in 1966, repairs and improvements have been made to the property most of the years through 1979. The property ranged in age from 11 1/2 years to 1/2 year as of January 1, 1978.

The appellee valued the personal property and assessed same at $4,684,500 for fiscal years 1979 and 1980 and $4,727,900 for fiscal year 1981. The appellee granted a partial abatement in 1979 that reduced the assessed value to $4,576,800.

The following outline sets forth data relating to jurisdiction which was submitted at the hearing:

| Docket No. | Fiscal Year | Form of List Filed |
|---|---|---|
| 106363 | 1979 | 2/21/78 |
| 112461 | 1980 | 2/23/79 |
| 113819 | 1981 | 2/27/80 |

| Application for Abatement Filed | Denial | Appeal Filed |
|---|---|---|
| 12/7/78 | 2/23/79 (Partial abtmt) (Deemed) | 5/18/79 |
| 12/11/79 | 3/11/80 | 5/14/80 |
| 11/19/80 | 11/28/80 | 1/8/81 |

The board finds that the Form of Lists were filed on time, the applications for abatement were filed within thirty days of the sending of the tax bills, the appeals filed on time and the taxes paid on time. The board has jurisdiction to hear these appeals.

Montaup, as a public utility company whose business is strictly wholesale, has its rates for electricity regulated by the Federal Energy Regulatory Commission (F.E.R.C.). It claims its earnings are regulated so as to provide a reasonable rate of return on the "net book value" or "rate base" of the property utilized in providing services. The "net book cost" or "rate base" is generally the original cost of the property less accrued depreciation as shown on the company's books. FERC allowed a rate of return of "roughly 12%".

The sole witness to testify for the appellant was its Treasurer and Clerk. He was acquainted with the acquisition costs of the property and the regulation of rates by the FERC. It is his opinion that the "net book cost" is the same as the "fair market value" of the property. His opinion of the "net book cost" is as follows:

| | |
|---|---|
| 1/1/78 | $3,220,443 |
| 1/1/79 | $3,149,548 |
| 1/1/80 | $3,121,817 |

He also calculated the "net replacement cost" of the property, but he did not consider it to be the fair market value of the property. He arrived at the replacement costs of the property by taking the acquisition costs and updating them to current price levels, on an installed basis, by means of the Handy Whitman Index for electric utility construction. He excluded from acquisition costs interest on construction and preliminary engineering costs in calculating net replacement cost, but included them in his net book cost calculation. He allowed a book depreciation of 3.3%, testifying that he used this rate because it was "accepted by IRS and FERC". His opinion of value by the "net replacement cost" method is as follows:

| | |
|---|---|
| 1/1/78 | $3,880,025 |
| 1/1/79 | $4,052,260 |
| 1/1/80 | $4,322,649 |

The board did not give any weight to the Treasurer's opinion of value using the "net replacement cost" approach to value. He gave his opinion of value as an officer of the corporation. He did not

qualify as an appraiser or engineer, but was allowed to testify as an officer of the appellant corporation. There was a lack of expert evidence as to just what uses could be made of the property. Three other electrical utilities operated in the area.

The only witness to testify for the appellee was a qualified appraiser with many years experience in the appraisal of commercial and industrial personal property generally, but only recently qualified as an expert witness for the appraisal of utility property. He relied solely on the "net replacement cost" of the property and he did not give consideration to net book value as an indicator of fair market value. Using the acquisition cost of the property furnished by the appellant, he updated these costs through use of the Handy Whitman Index. Considering the physical, functional and economic depreciation of the property, he allowed depreciation at a rate of 1.66% per year on the basis of a lifetime use of 60 years. It is his opinion that a 60-year life was applicable to all utility property generally; reasoning that constant repairs and improvements prolonged the life of the property.

His opinion of the fair market value of the property based on his replacement cost approach is as follows on the dates indicated:

| | |
|---|---|
| 1/1/78 | $5,463,120 |
| 1/1/79 | $5,761,270 |
| 1/1/80 | $6,297,690 |

Thus, there was no evidence in these appeals of the fair market value of the property based on a comparable sales or capitalization of income approach to value, with the appellant insisting that rate base value of necessity had to be fair market value while the appellee insisted that the value had to be based on a reproduction new less depreciation approach.

The Board refused to accept the appellant's claim that rate base value necessarily equated fair market value and found that appellant's witness was not qualified to develop a value based on

replacement cost new less depreciation with a sufficient degree of accuracy as to allow the Board to accept his conclusions. Furthermore, in the absence of a great deal more evidence about the utility company with respect to the nature of its business and its conduct, its financial structure, etc., the Board was unable to determine with any reasonable degree of precision the monetary effect of the limitation on appellant's earnings due to federal regulation by FERC or any particular weight which might be given to a rate base value. The only evidence on which the Board could reach a value was on the basis of a replacement cost approach less depreciation in the testimony and report introduced by the appellee's expert. Adjusting and modifying certain factors in the appellee's approach due to mathematical errors and a difference of opinion on the part of the Board with respect to such items as the rate of depreciation, the Board reached values in excess of the assessed value. Accordingly, the Board gave decisions for the appellee in all years.

The Board notes that the hearing on these matters was held on April 28, 1981 and that the appellant filed a "Legal Memorandum and Argument" on May 20, 1981. Although this filing was not in accordance with Rule 29 of the Rules of Practice and Procedure of the Appellate Tax Board, said document was accepted and docketed; the mathematical error pointed out in the appellee's expert's report on page 5, item 2(i) was noted and appropriate adjustments were made in the Board's computations.

It should also be noted that the Board issued a decision dated October 13, 1981, finding that an abatement was due the appellant for fiscal year 1979 with decisions for the appellee for fiscal years 1980 and 1981. However, that decision was based on a finding of disproportionate assessment practices based on the Department of Revenue's 1978 EQV. In accordance with Mass. Gen. Laws Chapter 58A, Section 13 and Rule 32 of the Rules of Practice and

Procedure of the Appellate Tax Board, the appellant filed a request for a report and findings of fact on all three docket numbers heard, and the appellee filed a request for a report and findings of fact on Docket No. 106363 only on October 20, 1981.

On November 16, 1981, the appellee filed a "Motion to Reconsider" the decision for the appellant pertaining to fiscal year 1979, with an affidavit stating that the Town of Whitman had effected revaluation as of January 1, 1978, for its fiscal year 1979 tax levies. It further alleged that inasmuch as the Board had found a fair cash value in excess of the assessed value, its decision should be for the appellee.

On November 25, 1981, the appellant filed a "Motion to Reconsider" all three fiscal years' decisions, alleging that the Board erred in its determination of fair cash value.

Both motions for reconsideration were heard on December 21, 1981 and the Board's decisions allowing appellee's motion, denying appellant's motion and promulgating a decision for the appellee for fiscal year 1979 issued on January 22, 1982.

## OPINION

The issue in this case is whether book value—rate base value—of a public utility is necessarily fair cash value for purposes of ad valorem taxation.

The appellant, through its evidence and arguments, strongly contended that net book value or original cost less depreciation is in fact the fair cash value of the property of a public utility because the utility is restricted in its earnings to its rate base by the Federal Energy Control Commission or by the Department of Public Utilities in Massachusetts.

That the limitation on public utilities' earnings pursuant to regulations of governing authorities is a factor in determining the fair market value on utility property is conceded. However, rate base value is not the sole factor in determining fair market value for purposes of taxation of utility property as contended by the appellant.

Once that rule is established, however, the further question arises as to whether any weight should be given to rate base value and, if so, how much. The question is asked in the context of what the true test for fair cash value is and what evidence is required to enable the appellant to sustain the appellant's burden of proof of value in general and to quantify the effect of the limitation on earning capacity in particular.

The Board's answer is, in part, that the weight to be given rate base as an indicator of value turns on the evidence in each case. In the "Watertown" case, the Board stated in its findings of fact and report on Page 16:

"The appropriate approach to the valuation of utility property will be determined by the board on the basis of the evidence and facts adduced in each case. The board recognizes that compelling evidence might be produced in a particular case where the facts are that the condition and prospects of a utility company, the state of the economy and other relevant facts might require a finding of fair cash value to be at or even below rate base value but nothing like such facts were introduced as evidence in the case before us."

The same can be stated with respect to the appeal presently before the Board.

The position taken by the Board in this case has been consistently applied, and the rule has been stated either directly or by implication in some of the leading cases decided over the years. **Assessors of Quincy v. Boston Consolidated Gas Company,** 309 Mass. 60 (Quincy); **Boston Gas Company v. Assessors of Boston,** 334 Mass. 549 (Boston); **Boston Edison Company v. Watertown,** 387 Mass. 298 (1982).

In **Northern Natural Gas Company v. Dwyer,** 208 Kansas 337 (Northern), the issue was the correct value of utility property. The evidence produced included

much data and information relating to a replacement cost approach, a capitalized earning approach, a rate base approach and a stock and debt approach. There was evidence on the primary money market, the bond market, cost of preferred stock, the common stock equity discount rates, adjusted utility operating income of the company, capitalization rates, stock prices over a period of years, earnings on stock over a period of years, dividends paid over a period of years, the gross value of Northern's property over a period of years, present and future production capacity, the company's history of growth, etc. **Northern** took the position that a replacement cost approach was "pointless" and "unreasonable". One of **Northern's** expert witnesses, Dr. Herbert B. Doran, said:

> "Currently and historically, the F.P.C. has not allowed a fully adequate rate of return to Northern . . . which would allow the return of combined cost of equity, cost of preferred stock, and cost of long-term debt equal to presently demanded rates of return of prudent investors."

Accepting that fact as true, a point to be made is that as a practical matter, investors still invested.

In **Northern,** the court stated at Page 354, speaking of Dr. Doran:

> "He testified that the capitalization of income is ultimately the economic basis for the value of income-producing property."

Dr. Doran then determined a net utility income "by adding the **investment tax credit** and interest charged to construction" which he capitalized. (Emphasis supplied).

In **Northern,** it is interesting to note Dr. Doran, the appellant's expert, **gave no weight to rate base value!**

A second expert for **Northern** gave 10% weight to a stock and dividend value, 40% to rate base value, and 50% to capitalized income.

The appellee's expert gave 85% weight to replacement cost new less depreciation and 15% to capitalized earnings to reach a value **$3,000,000 more than original cost and $76,000,000 more than original cost less depreciation.** This witness also gave no weight whatsoever to rate base value. Ultimately, the weight to be given to an approach to value must be derived from expert opinion and the experienced judgment of the appraiser.

On appeal, the court sustained the appellee's value developed as stated.

The **Northern** case involved extensive utility properties of great value but the principles and problems involved are in general the same, regardless of the size of the property. As to cases in Massachusetts involving extensive properties where these principles were applied, see "Quincy" and "Boston", supra, where in the latter case in addition to the usual approaches to value, a "sale and lease back" approach was also used.

For a study on sales of utilities across the country and comparing rate base value to selling prices of utilities, see "Report of Sales of State and FERC Regulated Utility Facilities", Martin D. Miner, ASA, Revised 1/20/82. This is a report tabulating sales of electric and gas plants and facilities over the past five years. One utility with a rate base of $3,000,000 sold for $18,500,000.

The fair cash value of property, most especially utility property, cannot be determined with mathematical certainty but must ultimately rest in the realm of the opinion, estimate and judgment of experts. **Assessors of Quincy v. Boston Consolidated Gas Company,** 309 Mass. 60-72. However, this does not excuse the appellant from carefully preparing and presenting all necessary evidence. The board is not required to accept the opinion expressed on valuation principles used even by expert witnesses. **Assessors of Nahant v. Thomas P. Costin, Inc.,** 356 Mass. 726, 727.

As to what approaches to value are appropriate in valuing utility property and the evidence needed to reach a value, our court has stated and restated the following principle: "The market value of

this kind of property must be ascertained from a consideration of all the factors that ought to influence the judgment of a seller and a buyer in reaching a fair price.'' **Assessors of Quincy v. Boston Consolidated Gas Co.,** at page 66 and quoted in **Boston Gas Company v. Assessors of Boston,** at page 572.

All appellants, including public utilities, have the burden of proof which, in the opinion of the Board, means the burden to produce that quantity and quality of evidence which the nature, complexity and extent of the property valued requires. Valuing public utility property presents some of the most complex, sophisticated and perplexing problems in the science of appraising.

In practice, no prudent seller or buyer would take or pay the kind of huge sums of money involved without full knowledge of all the necessary facts concerning the company to enlighten the parties as to the company's history, its operation, its financial structure, its profits past and present, as well as its potential for future profits, etc., etc. For the same reasons, it is very difficult to assign weights to values reached by the two cost approaches to value set before us in the instant fact situation.

If the appellant is convinced of the validity of a theory of law or appraisal, e.g., rate base value equals fair cash' value, and appellant chooses to introduce only that kind of evidence the appellant feels is relevant to his theory, he runs the chance of losing the appeal if his theory is wrong. In the case presently on appeal, the Board was of the opinion that the appellant failed to introduce that quantity and quality of evidence which would enable the Board to make a determination with any reasonable degree of accuracy as to what weight should be accorded the rate base value.

In conclusion, the Board reached a value as best it could on that evidence which in its opinion it could rely and ordered decisions for the appellee.

Our decisions were promulgated on January 22, 1982.

**APPELLATE TAX BOARD**
**By John P. Mulvihill, Chairman**
A True Copy
**Attest: Richard B. Willis, Clerk**