BOSTON EDISON COMPANY *vs.* BOARD OF ASSESSORS OF
WATERTOWN.

Suffolk.   October 4, 1984. — December 13, 1984.

Present: HENNESSEY, C.J., WILKINS, ABRAMS, & O'CONNOR, JJ.

*Taxation*, Personal property tax: value, public utility.

A decision by the Appellate Tax Board to determine the fair cash value of a
utility's taxable personal property by giving almost complete weight to
the net book cost, or rate base value, of the property was supported by
substantial evidence and was not erroneous as matter of law. [512-515]

APPEAL from a decision of the Appellate Tax Board.
*Oliver Oldman (Edward G. Seferian* with him) for the Board
of Assessors of Watertown.
*George Marshall Moriarty (Harvey J. Wolkoff* with him)
for the taxpayer.
ABRAMS, J. The central issue on this appeal is the proper
formula to be applied in valuing taxable personal property
owned by Boston Edison Company (Edison) in Watertown for
the fiscal years 1976, 1977, and 1978. The Appellate Tax
Board (board), on remand from this court, *Boston Edison Co.
v. Assessors of Watertown*, 387 Mass. 298, 308 (1982) (*Watertown I*), determined to value Edison's property by giving 97%
weight to the property's net book cost (or rate base value) and
3% to its depreciated reproduction cost (DRC).[1] The assessors
contend that the board's decision was erroneous as a matter
of law and that the board's original valuation at 95% DRC and

---

[1] "The [DRC] approach involves, for each item of property, a determination of its value based on the current cost of reproducing it, reduced by physical, functional, and economic depreciation. The net book cost, or the rate base value, of property is its cost when first devoted to public use, reduced by accrued depreciation" (footnote omitted). *Watertown I, supra* at 300-301.

5% net book cost must be reinstated. We conclude that the board's determination is not erroneous as a matter of law and therefore we affirm.

Pursuant to the remand, the board reopened the case "for the introduction of further evidence by the parties, a) on the [DRC] methodology of valuation and more particularly pertaining to the basis for the rates of depreciation utilized by the experts; b) on the circumstances in this case that would induce a willing buyer to pay more than the rate base value of the personalty or the value placed on the property by the Board; [and] c) any other evidence which will assist the Board in determining fair market value of the property."[2] Hearings were held on August 1 and 2, 1983, at which Edison presented evidence through seven witnesses; the assessors did not introduce any evidence. On February 3, 1984, the board, in its findings of fact and report, stated that Edison "by persuasive evidence [had] established the absence of . . . special circumstances" which would induce a willing buyer to pay more than rate base value for the personal property held by Edison in Watertown. The board further found that the assessors had failed to sustain their burden to offer "some evidence . . . to show that, because of such circumstances, the relevance of rate base value is put in question." *Montaup Elec. Co.* v. *Assessors of Whitman*, 390 Mass. 847, 855 (1984). Thus, on remand the board adopted the figures of Edison's expert — computed on the rate base approach — in its final valuation of the property.

On appeal, the assessors concede that there is substantial evidence for a finding based on either net book cost or DRC or some combination of the two. Their contention, here made for the first time,[3] is that they had successfully demonstrated "a reasonable basis in logic for ignoring . . . the fact that a

[2] The board would "not admit further testimony on net book cost of [Edison's] property."

[3] General Laws c. 58A, § 13, as amended through St. 1983, c. 72, § 2, reads in pertinent part: "The court shall not consider any issue of law which does not appear to have been raised in the proceedings before the board."

potential buyer, if it were a public utility, would be considerably influenced by the return to which it would be limited on whatever investment it made," *Watertown I, supra* at 304, and that the board's original decision, according almost complete weight to the DRC method, was therefore justified.

The assessors rely on New York law for the proposition that special purpose property must be valued at DRC. The real property tax law of New York provides that a "special franchise" be assessed annually at its "full value." N.Y. Real Prop. Tax Law §§ 600(1), 606(1) (McKinney 1984). "Full value" has been interpreted to mean DRC in the case of "special franchise" property: "It has consistently been held that the proper and accepted method for the valuation of a 'specialty' is reproduction cost new less depreciation, except in a case where, because of the newness of the property, actual construction cost may adequately and fairly reflect its value." *Consolidated Edison Co. of N.Y.* v. *State Bd. of Equalization & Assessment*, 101 Misc. 2d 910, 913-914 (N.Y. Sup. Ct. 1979), modified on other grounds, 83 A.D.2d 355 (N.Y. App. Div. 1981), aff'd, 58 N.Y.2d 710 (1982).[4] After an extensive study, New York codified its standard in N.Y. Admin. Code tit. 9, §§ 197-1.1, 197-3.2 (1983). Section 197-3.2 mandates that the tangible property of electric corporations be valuated at "the reproduction cost new, less depreciation of the tangible property." See generally New York State Board of Equalization & Assessment, Report on Special Franchise Assessment Administration 18-29 (1983) (cases collected).

---

[4] The assessors also direct us to the "famous case" of *People ex rel. N.Y. Stock Exch. Bldg. Co.* v. *Cantor*, 221 A.D. 193, 195 (1927), aff'd mem., 248 N.Y. 533 (1928), where the court valued the New York Stock Exchange building at its DRC, despite the company's argument that the building did not "enhance the value of the land except 'as a tear-down proposition.'" The New York court would not permit the property to escape taxation when "the market value would be difficult, if not impossible, to find." *Id.* at 197. But even then, the relevant New York statute required that property be assessed "at the full value thereof," *id.* at 196, as distinct from G. L. c. 59, § 38, which demands a determination of the "fair cash valuation" of the taxable property.

Massachusetts law, however, requires assessors to base valuation of special purpose property on the "fair cash valuation" of the taxable property. G. L. c. 59, § 38. "Fair cash valuation," as our cases have stated repeatedly, means fair market value. See, e.g., *Watertown I, supra* at 301. Unlike New York, we have no special study or regulation which compels the board to utilize DRC as the dispositive figure for the valuation of Edison's Watertown property. Thus, the board did not err as a matter of law in using the Massachusetts standard.

The assessors next ask us to apply an "intrinsic value" formula to the Edison property on the authority of our decision in *Mashpee Wampanoag Indian Tribal Council, Inc.* v. *Assessors of Mashpee*, 379 Mass. 420 (1980). We find nothing in *Assessors of Mashpee* which affects our holdings in *Watertown I* or in *Montaup Elec. Co.* In *Assessors of Mashpee, supra* at 421, we held it "proper to determine fair cash value from the intrinsic value of the property" in circumstances in which land, subject to deed restrictions, was not saleable. We did not, however, abandon the requirement that the assessors strive to determine the fair cash value of the property. *Watertown I, supra* at 304.

The assessors further contend that (1) nothing in the record establishes the economic obsolescence of Edison's business or of the Watertown property; (2) a willing purchaser might pay a premium over net book cost; and (3) the Department of Public Utilities (DPU) might allow a rate base greater than net book cost to a purchase.[5] These assertions are without merit.

On remand, Edison introduced evidence through several expert witnesses that DPU's ceiling on the future stream of

---

[5] We noted previously the DPU's "apparently longstanding position . . . that, if a regulated utility sells an asset to another regulated, public utility, the basis of that asset in the hands of the transferee remains the same as that of the transferor for rate-making purposes. Thus, if Edison were to sell any of its taxable personal property in Watertown to another public utility, that other utility would be allowed a return on the transferred property based on that property's net book . . . value, and not on any higher purchase price it might have paid." *Watertown I, supra* at 301.

Edison's earnings constituted economic depreciation.[6] Moreover, while the board *might* have found that a willing purchaser might pay a premium over net book cost, and *might* have concluded that the DPU might increase the allowed return to a prospective purchaser, Edison again furnished more than ample evidence to support the board's determinations to the contrary.[7] Since the board's decision is supported by substantial evidence, there is no basis to disturb its findings.

We are left, in the end, with a record in which the assessors did not avail themselves of the opportunity to explain, "by reference to substantial evidence or to reasoned principle, why a buyer would want to pay more than Edison's net book value, when by investing the same dollars elsewhere that buyer could obtain a better return." *Watertown I, supra* at 304-305. The decision of the Appellate Tax Board is affirmed.

*So ordered.*

---

[6] For example, one of Edison's expert witnesses testified that: "Economic depreciation is that part of the cost approach which reflects the realities of the marketplace. Now a utility property has its earnings restricted. And in any approach in the determination of market value, it's important that I incorporate the realities of the marketplace. So if I ignored the fact that the utilities earnings are restricted by leaving the economic depreciation out of my cost approach, I would have simply determined the physical cost of the property and not what a willing buyer would pay for this property."

[7] Another of Edison's witnesses testified as follows: "My opinion is that a well informed and willing buyer would have no reason, no economic and rational reason, to pay a premium above net book cost for the property in question. And having no reason, he would not do so." The witness later added: "[I] have already dismissed before the possibility that the DPU would allow a return higher than the fair net book. So that possibility is out."