BOARD OF ASSESSORS OF BROOKLINE *vs.* GEORGE V. BUEHLER
& another,[1] trustees.

Suffolk.   September 9, 1985. — January 16, 1986.

Present: HENNESSEY, C.J., LIACOS, ABRAMS, NOLAN, & O'CONNOR, JJ.

*Value. Taxation,* Real estate tax: value. *Evidence,* Value.

In a proceeding before the Appellate Tax Board brought by a taxpayer
seeking abatement of real estate taxes on certain property in the town
of Brookline, in which the board used a capitalization of income approach
to determine the value of the property, there was substantial evidence
to support the board's adoption of an expert witness's expense figures
and the board's use of an 11.5% rate of return. [524-530]

On appeal by a local board of assessors from a decision of the Appellate
Tax Board determining the value of certain real property using a capitali-
zation of income approach, this court declined to consider whether the
board should have used average rather than actual insurance costs in
computing net income, where it appeared that choice of actual or average
costs would not have affected the abatement granted by the board.
[530]

In determining the value of certain real property using a capitalization of
income approach, the Appellate Tax Board did not err in determining
that a reserve for replacement allowances provided for expenses of an
ordinary rather than a capital nature and that the allowances were properly
includible as expense items in calculating net income. [531]

In a proceeding before the Appellate Tax Board brought by a taxpayer
seeking abatement of real estate taxes, evidence that the taxpayer had
made statements before a rent control board which were inconsistent
with his present position, and that the property in question was insured
far in excess of the value the taxpayer attributed to the property in this
proceeding, was not binding on the taxpayer, but could be considered
by the Appellate Tax Board in determining the weight of the evidence
before it. [531-532]

On appeal by a local board of assessors from a decision of the Appellate
Tax Board granting a real estate tax abatement, the assessors were not
entitled to raise an issue which had not been presented in the proceedings
before the Appellate Tax Board. [532]

[1] Jacqueline T. Buehler.

APPEAL from a decision of the Appellate Tax Board.

*David Lee Turner,* Town Counsel, for the Board of Assessors of Brookline.

*Eric W. Wodlinger (Donald L. Connors* with him) for the taxpayers.

O'CONNOR, J. The board of assessors of Brookline (assessors) appeals from a decision of the Appellate Tax Board (board) granting George V. Buehler and Jacqueline T. Buehler, trustees of Buehler Realty Trust (taxpayer), abatements of real estate taxes for fiscal years 1981 and 1982. At issue is the appropriate valuation of two apartment buildings in the town. On appeal, the assessors contend that the property values calculated by the board for fiscal years 1981 and 1982 under the capitalization of income method are not supported by substantial evidence. Specifically, the assessors challenge the rate of return component of the over-all capitalization rate applied by the board and the board's deduction of actual insurance costs and reserve for replacement allowances in computing net income figures for the properties. In addition to their lack of substantial evidence claims, the assessors argue that the board improperly ignored statements of value made by George Buehler before the Brookline rent control board and erroneously disregarded the determination of value reflected by the amounts of insurance coverage carried by the taxpayer on the subject properties for the fiscal years at issue. The assessors also claim that the taxpayer should have been barred by the doctrine of res judicata from attacking the assessors' capitalization rates in the proceedings before the board.

We conclude that the property values determined by the board are supported by substantial evidence. We also conclude that the board was warranted in disregarding both George Buehler's statements to the rent control board and the amounts for which each property was insured for fiscal years 1981 and 1982. We do not reach the assessors' res judicata claim because the issue was not properly brought to the attention of the board in the proceedings below. Accordingly, we affirm the board's decision granting abatements of real estate taxes for fiscal years 1981 and 1982.

We summarize the underlying facts as found by the board. The apartment buildings in question are located at 89-95 Longwood Avenue and 12-20 Alton Place in Brookline and contain twenty-five and thirty-two apartments respectively. All the apartments were subject to rent control for the fiscal years at issue. The Brookline rent control by-law, in addition to regulating rents, restricts a landlord's right to evict a tenant for purposes of condominium conversion. Many of the apartments were rented to older persons among whom turnover is negligible. On September 4, 1980, the properties also became subject to Article 39 of the town by-laws which further regulates and restricts the conversion of rental apartments to condominiums.

The assessors valued the Alton Place property at $385,000 for the 1981 fiscal year and $1,530,000 for fiscal year 1982. The Longwood Avenue property was assessed at $320,000 and $1,100,000 for the 1981 and 1982 fiscal years. The assessors levied real estate taxes on the parcels at rates of $98 per thousand for the 1981 tax year and $24.96 per thousand for fiscal year 1982. The parties stipulated that the taxpayer paid the real estate taxes in a timely and proper manner using the three-year averaging method provided for by G. L. c. 59, § 64. They further stipulated that, as to each property for the tax years at issue, the first-half taxes were paid and abatement applications filed within thirty days of the mailing of the tax bills. After the assessors refused the taxpayer's requests for abatements, the taxpayer appealed to the board pursuant to G. L. c. 59, §§ 64, 65, arguing that its property had been overvalued for the 1981 and 1982 fiscal years and disproportionally assessed for fiscal year 1981.

The parties in their presentations to the board and the board in its decision used the capitalization of income approach to arrive at the fair cash value of the subject properties. The capitalization of income approach is an appropriate method for calculating the fair cash value of income-producing real estate. *Taunton Redevelopment Assocs.* v. *Assessors of Taunton,* 393 Mass. 293, 295 (1984). Under this approach, a valuation figure is determined by dividing net operating income by a capitali-

zation rate. *General Elec. Co.* v. *Assessors of Lynn,* 393 Mass. 591, 609 (1984). The net income component of the fraction is computed by deducting operating expenses from gross rental income and the over-all capitalization rate is the sum of an appropriate rate of return and a tax factor. *Id.* A tax factor is included in the over-all capitalization rate in order to reflect the tax which will be payable on the assessed valuation. *Taunton Redevelopment Assocs.* v. *Assessors of Taunton, supra* at 295.

Both parties presented expert testimony to the board. All the witnesses agreed that the economic rents were the maximum permitted under rent control and the parties were in substantial agreement as to the tax factors to be applied. However, the experts sharply disagreed as to the appropriate rate of return component of the over-all capitalization rate. The experts also expressed differing views as to whether, in computing net income, an allowance for anticipated replacement costs should be deducted from gross rental income and whether insurance expense amounts should reflect actual or average costs. The assessors' witnesses used rates of return of 5.62% to 6% in their valuation calculations, while the experts presented by the taxpayer testified that rates of return of 13.41% and 12.5% were appropriate. Edward Wadsworth, the taxpayer's principal expert, deducted reserve for replacement allowances in a range of $4,671 to $5,611, and actual insurance costs, in determining net income amounts for the years at issue. Three of the experts presented by the assessors made no provision for reserve for replacement allowances in their net income calculations. The assessors' expert who did provide for reserve for replacement allowances, Richard Dennis, determined that deductions ranging from $700 to $1,000 were justified. Unlike the other witnesses, Dennis also chose to use average rather than actual insurance costs in arriving at net income.

In its decision, the board stated that it adopted Wadsworth's expense calculations in determining net income amounts for the properties and selected a rate of return of 11.5% for both tax years at issue. The board applied the 11.5% rate of return plus tax factors of 4.73% for 1981 and 2.496% for 1982 to

net income amounts and arrived at property values of $528,750 and $633,250 for the Longwood Avenue property and $696,400 and $852,700 for the Alton Place parcel. As to the taxpayer's disproportionate assessment claim, the board noted that a taxpayer is entitled to be taxed at the amount he would have been taxed had the municipality been assessing all property at full value. Accordingly, in computing the taxpayer's tax liability for the 1981 fiscal year, the board applied an equalized tax rate of $47.30 per thousand.[2] The board applied a rate of $24.96 per thousand for fiscal year 1982 and determined that the taxpayer was entitled to abatements totaling $39,695.89. On appeal, the assessors challenge only the property values determined by the board.

1. *Substantiality of the Evidence.*

The assessors argue first that the rate of return selected by the board and the board's adoption of Wadsworth's expense figures are not supported by substantial evidence. It is clear that decisions of the board must be supported by substantial evidence. Substantial evidence is "such evidence as a reasonable mind might accept as adequate to support a conclusion," taking "into account whatever in the record fairly detracts from its weight." *New Boston Garden Corp.* v. *Assessors of Boston,* 383 Mass. 456, 466 (1981). After reviewing the record in this case, we conclude that the board's decision is based on substantial evidence.

The fact that no witness testified to a rate of return of 11.5% is not significant. The board is not required to accept the actual computations of any of the witnesses who testified before it. *Assessors of Lynnfield* v. *New England Oyster House, Inc.,* 362 Mass. 696, 700 (1972). In selecting a rate of return, the

---

[2] Under G. L. c. 58A, § 14, the board is directed to compute an equalized tax rate when it finds that a taxpayer has been assessed disproportionately with respect to other properties within a municipality. An "equalized tax rate" is computed by dividing the total taxes assessed for a municipality by the fair cash value of all taxable property of that community. G. L. c. 58A, § 14. The equalization valuation figures prepared by the Commissioner of Revenue may be used for this purpose. *Assessors of Danvers* v. *Tenneco, Inc., Tenn. Gas Pipeline Div.,* 388 Mass. 739, 742 (1983).

board stated that it did not give much weight to the expert testimony presented by the assessors and gave more weight to the rates offered by the taxpayer's experts. Two of the tax-payer's witnesses, Wadsworth and Charles Akerson, testified to rates of return tending to support the rate selected by the board. Wadsworth testified that he arrived at a rate of return of 13.41% by taking "a blend of returns to the debt position and the equity position assuming market rate financing for the property." This rate derivation approach is sometimes referred to as the band of investment technique. American Institute of Real Estate Appraisers, The Appraisal of Real Estate 391 (8th ed. 1983).[3] At the hearing before the board, Wadsworth stated that he assumed that a thirty-year loan at 16.75% would make up 80% of the capital required to purchase the property. Given this assumption, Wadsworth determined a mortgage constant of 16.86%. (The mortgage constant is a function of the interest rate, the frequency of amortization, and the terms of the loan, see n. 3.) He then combined the debt portion of the band of investment rate formula with an expected yield of 13.5% from the 20% equity investment and arrived at a weighted average rate of 16.19%. From this rate, Wadsworth told the board, he deducted .12% to reflect the owner's equity build up over a ten-year term and subtracted 2.65% to reflect price appreciation of 5% a year over a ten-year period. The final result of these

---

[3] As stated by the American Institute of Real Estate Appraisers, a rate of return is derived under the band of investment technique by analyzing return requirements on the combination of debt and equity capital typically used to purchase property. The band of investment rate formula can be stated as follows:

Rate of Return $= M \times RM + (1-M) \times RE$, where
$M$ = the loan to value ratio;
$(1-M)$ = the equity to value ratio;
$RM$ = the mortgage constant required by the lender; and
$RE$ = the return expected on the equity investment.

The mortgage constant is a function of the interest rate, the frequency of amortization, and the term of the loan. An appraiser may derive mortgage terms and conditions by surveying lenders in the market area. The return expected on the equity investment can be estimated by analyzing yields from comparable sales. American Institute of Real Estate Appraisers, The Appraisal of Real Estate 391-393 (8th ed. 1983).

calculations was an over-all rate of return of 13.41%.[4] Wadsworth confirmed the probative value of this rate by comparing it to then prevailing rates of return on alternative investments.

The assessors argue that the board should not have relied on the 13.41% rate of return derived by Wadsworth because he did not abstract his rate of return from the Brookline rent control market. In support of this position, the assessors rely on the well-settled principle that real estate should be valued for assessment purposes at amounts that reflect "what a willing buyer would pay a willing seller for the property." *Boston Edison Co.* v. *Assessors of Watertown,* 387 Mass. 298, 305 (1982). While it is true that results obtained under the capitalization of income approach should reflect what a willing buyer would pay a willing seller, it is not necessary that the rate of return element of the valuation equation be derived directly from the market sought to be analyzed. The only requirement is that the rate derived "should reflect the return on investment necessary to attract investment capital." *Taunton Redevelopment Assocs.* v. *Assessors of Taunton, supra* at 295. Thus, the board's consideration of Wadsworth's rate of return was justified even though Wadsworth did not derive his rate directly from the Brookline market.

In addition to challenging the legitimacy of the band of investment technique itself, the assessors attack Wadsworth's application of the technique. The assessors challenge two aspects of Wadsworth's methodology in particular. First, the assessors criticize Wadsworth's assumption of a loan of 80% of the purchase price at a constant rate of 16.86% for a term of thirty years. The assessors argue that an assumption of a thirty-year mortgage is not supported by the evidence. The assessors also attack Wadsworth's rate adjustment of 2.65% reflecting price appreciation of only 5% a year for a ten-year period. The assessors argue that the reduction should

---

[4] Wadsworth also derived a rate of return of 12.6% from a study he made of comparable sales. Due to deficiencies in his study, Wadsworth did not place emphasis on this result and the board did not rely on this rate in its rate determination. Accordingly, we need not comment on Wadsworth's comparable sales study.

have reflected appreciation rates of 16 to 20%. These criticisms do not require the conclusion that the board's reliance on Wadsworth's testimony was unreasonable. The assessors have failed to show any impropriety in Wadsworth's assumption of a thirty-year mortgage in applying the band of investment formula. Furthermore, the board was not bound to accept the assessors' evidence of appreciation rates of approximately 20%, particularly in light of the limitations on condominium conversion and the substantial number of elderly tenants living in the buildings. The board reasonably could have concluded that a rate of appreciation somewhere between 5 and 20% was fair and have factored such a rate into its determination that an 11.5% rate of return on investment was appropriate. The evaluation of such intangible factors is within the board's province. Therefore, we conclude that the board was warranted in granting weight to Wadsworth's testimony in selecting a rate of return of 11.5%.

In addition to Wadsworth, the taxpayer presented the expert testimony of Charles Akerson. Although Akerson did not offer an opinion of value as to the subject properties, he did offer an opinion as to an appropriate rate of return for the tax years at issue. For those years Akerson stated it was his opinion that investors in residential rental properties in the Boston metropolitan area sought a rate of return of 12.5%. The assessors argue that Akerson's testimony was not entitled to weight because his rate was based only on "street experience" and not on a detailed study of the Brookline rent control market.

Although Akerson did not derive his rate of return directly from the Brookline market, the board nevertheless was warranted in granting weight to Akerson's testimony. The board found Akerson to be a qualified real estate appraiser and the record supports the board's finding. Based on Akerson's qualifications and experience, the board properly could have concluded that the rate of return offered by Akerson was representative of a rate of return demanded by the typical investor in residential rental properties. Because the board reasonably could have decided that the rates offered by Wadsworth and Akerson approximated rates of return "necessary to attract

investment capital," *Taunton Redevelopment Assocs*. v. *Assessors of Taunton, supra,* we conclude that the rate of 11.5% selected by the board was amply grounded in credible affirmative evidence.

Not only are we satisfied that there is an adequate evidentiary basis for the board's rate, but also we conclude that no evidence offered by the assessors so detracts from the weight of the supporting evidence that it renders the evidence less than substantial. The board was warranted in concluding that the rate of return calculations offered by the assessors' expert witnesses lacked both probative force and reliability. At the hearing below, the assessors presented the expert testimony of Joseph Eckert, Francis Ryan, Richard Dennis, and Thomas Schenck. Eckert and Schenck derived rates of return from their own studies, while Dennis and Ryan relied on Eckert's rate in determining property values under the capitalization of income approach. Eckert and Schenck testified they calculated rates of return by analyzing the ratio of net income to sales price of properties included in their sales studies. The technique employed by Eckert and Schenck is known as the derivation from comparable sales technique. American Institute of Real Estate Appraisers, *supra at* 389. Eckert stated he abstracted a rate of 5.62% from a study he made of the Brookline rent control market. Eckert's study purported to include all rent control properties of nine units or more sold in Brookline in 1979 and 1980. Schenck testified that he performed his own sales study and calculated a rate of return of 7.5%. After reviewing the result of Eckert's study, Schenck stated he revised his rate to 6%.

The assessors claim that the board erroneously discounted the rates derived by Eckert and Schenck from comparable sales. According to the assessors, the derivation from comparable sales technique is the preferred technique because a rate of return is abstracted directly from the market. Therefore, the assessors argue, the board should have given greater weight to the testimony of its experts. As we stated earlier in this opinion, under the capitalization of income approach a rate of return need not be abstracted directly from the market. It is

only necessary that the rate "reflect the return on investment necessary to attract investment capital." *Taunton Redevelopment Assocs.* v. *Assessors of Taunton, supra.* Also, there are other reasons, which we discuss below, justifying the board's giving little weight to the rates offered by the assessors' experts.

While the comparable sales technique is one of four rate derivation techniques generally accepted by the financial community, there is authority for the proposition that the comparable sales technique is the preferred method only "when financing terms and market conditions that affect the comparables are similar to those affecting the subject property (or an adjustment can be made for them)." American Institute of Real Estate Appraisers, *supra* at 390. The assessors admit in their brief that "a large number of sales . . . involved seller financing; the terms of such financing were not generally available." According to the assessors, however, no adjustment of the stated sales price was required because seller financing "made the market" during the tax years at issue. Therefore, the assessors argue, Eckert and Schenck correctly used the stated sales prices of such properties in their rate calculations. This argument is not convincing. Because the stated prices of many of the sample properties reflected low interest seller financing, which tends to result in inflated prices, the board was justified in rejecting these sales as not comparable and therefore unreliable in terms of determining a rate of return. See *Alstores Realty Corp.* v. *Assessors of Peabody,* 391 Mass. 60, 65 (1984). The board reasonably concluded that the failure of Eckert and Schenck to reduce the stated prices of sample properties involving seller financing to cash equivalent prices distorted the valuation ratio, and that, as a result, the rates calculated by Eckert and Schenck under the derivation from comparable sales technique were artificially low.

The assessors argue not only that their rates of return were entitled to weight because they were derived by the soundest methodology, but they also contend that cash flow rates of return of 5.62% and 6% would have been satisfactory to a prudent investor in light of the high rate of appreciation of residential property in Brookline. The answer to the assessors'

contention is that the board was not required to accept the assessors' views concerning rate of appreciation and, also, the board properly could have concluded that in any event a rate of return of approximately 6% would have been unacceptable to an investor during a period when interest rates on alternate low risk investments were over 10%. See *Boston Edison Co. v. Assessors of Watertown, supra* at 305 ("We see no reason why a willing buyer would . . . purchase property on which it would expect to obtain an annual return of approximately . . . 5.2%"). We conclude that the board was justified in rejecting the rates presented by the assessors and in selecting a rate of return more nearly approximating the rates presented by the witnesses for the taxpayer.

In addition to disputing the rate of return selected by the board, the assessors challenge the board's deduction of actual insurance expenses and reserve for replacement allowances in computing net income figures for the subject properties. First, the assessors argue that the board should have used average rather than actual insurance costs in computing net income. In support of this position the assessors point to the testimony of George Buehler where he stated, "[W]hen you are estimating depreciation, operating expenses can change from year to year. So you look at a level — a level expenditure." According to the assessors, Buehler used average or "stabilized" expenses only when it suited his purposes, using average costs when his actual costs were low, substituting actual expense figures when particular costs showed a marked increase. The assessors argue that average rather than actual insurance costs should have been used by the board, because a consistent method of estimating expenses should be used in computing net income. We need not resolve the question. The assessors fail to demonstrate how the board's use of actual rather than average insurance costs affected the total abatement granted by the board. Regardless of whether actual or average costs were used in the net income calculations, the total insurance costs for the 1981 and 1982 fiscal years are virtually the same and, therefore, the total abatement granted to the taxpayer is unaffected.

The assessors also contend that no reserve for replacement allowances should have been deducted by the board in computing net income figures for the properties. According to the assessors, the improvements provided for by these allowances are of a capital nature intended to increase the value of the properties. Therefore, the assessors contend, the reserve for replacement amounts are not properly classified as operating expenses. However, there was evidence warranting a conclusion that the reserves were not for expenditures of a capital nature. George Buehler testified that the reserve for replacement allowances were based on his actual experience in replacing building components such as roofing materials, heating equipment, and electrical fixtures as they would wear out. On the basis of this testimony, the board reasonably could have concluded that the reserve allowances provided for expenses of an ordinary rather than a capital nature and were properly includible as expense items in its net income calculations. Accordingly, we decline to disturb the board's decision to include reserve for replacement allowances as deductions in arriving at net income. See *Alstores Realty Corp.* v. *Assessors of Peabody, supra* at 65 ("The issue of what expenses may be considered in any particular piece of property is for the board").

2. *Other Evidence of Value.*

The assessors argue that the board erred when it ignored statements of value made by George Buehler before the Brookline rent control board inconsistent with the taxpayer's present position, and when it disregarded the fact that the taxpayer carried insurance coverage on the properties far in excess of the values the taxpayer attributes to the properties in this case. Contrary to the position apparently taken by the assessors, this evidence is not binding on the taxpayer, but goes only to the weight of the evidence presented to the board. To the extent that those items of evidence constitute admissions on the part of George Buehler, the board was entitled to disregard such evidence and to accept the values generated under the capitalization of income valuation method as the best evidence of the fair cash values of the properties. The function of weighing the evi-

dence is for the board. See *North American Phillips Lighting Corp.* v. *Assessors of Lynn,* 392 Mass. 296, 300-301 (1984).

3. *Res Judicata.*

Finally, the assessors argue that the taxpayer should be barred from attacking the capitalization rates used by the assessors in their property valuation calculations by the Superior Court's decision in Jeffrey Carlton *vs.* Francis Ryan.[5] We have been told very little about that case. In any event, we need not reach any res judicata issue because the res judicata claim advanced on appeal was not properly presented to the board in the proceedings below. In order to preserve an issue of law for appeal, a party must raise the issue in the proceedings before the board by way of answer, motion, or request for rulings of law. See Rules 12, 16, and 29 of the Rules of Practice and Procedure of the Appellate Tax Board (1982). The assessors point only to remarks made by counsel during the proceedings below to demonstrate that the issue was properly raised. That was not sufficient to preserve the issue for decision here.

> *Decision of the Appellate Tax*
> *Board affirmed.*

---

[5] Superior Court, Norfolk County, Civil Action No. 137431 (April 11, 1983). Although the parties did not furnish the court with a copy of this decision, it appears that the case involved allegations of widespread discriminatory assessments by the assessors.