NEW BOSTON GARDEN CORPORATION *vs.* BOARD OF
ASSESSORS OF BOSTON.

Suffolk.  February 20, 1987. — May 4, 1987.

Present: DREBEN, KAPLAN, & FINE, JJ.

*Taxation,* Appellate Tax Board: record; Appraisers; Real estate tax: assess-
ments, value. *Value. Administrative Law,* Substantial evidence.

Although, in proceedings to determine the proper real estate tax assessments
on the Boston Garden arena complex, the Appellate Tax Board erred in
denying requests by counsel for the city for permission to make a copy
of a written report prepared by the Garden's expert appraiser for use
during an overnight recess in order to prepare for the next day's cross-
examination, the city was not prejudiced by the board's rulings, where
there was nothing in the report to which the city's attorney did not have
access before the hearing and at various earlier times during the hearing,
and where it was not clear whether any additional access to the report
would have affected the substance of the cross-examination or the board's
decision; furthermore, the record did not indicate any instances in which
the city's right of cross-examination was unnecessarily restricted. [124-127]
On appeal from a decision of the Appellate Tax Board granting real estate
tax abatements for five consecutive fiscal years to the owners of the
Boston Garden arena complex, the city was precluded from contending
for the first time that the board had erred in imputing a market rate
management fee in determining the Garden's annual expense for manage-
ment of the real estate, rather than allowing only actual expenses incurred
by the Garden for management [127-128]; that the board had erred in
imputing rents for copromotion leases in determining income, which in
most instances were lower than the actual rents [128-129]; that the board
had erred in imputing rents in determining income rather than using
actual receipts for sporting events involving the Boston Bruins ice hockey
team [129]; and that the board had erred in accepting the 7.5% recapture
of investment rate recommended by the Garden's expert appraiser be-
cause it was not based on substantial evidence [129-132].
In a proceeding before the Appellate Tax Board to determine the proper
real estate tax assessments on the Boston Garden arena complex in which
the board's use of the capitalization of income approach required the
board to make findings on the Garden's annual income and expenses

related to the operation of the real estate and, on the basis of those findings, to determine net operating income, the board's finding that income derived, according to the Garden's own financial statements, from "Causeway Advertising" should be disregarded was not supported by substantial evidence in the record. [132-134]

APPEAL from a decision of the Appellate Tax Board.

*John D. Stuebing,* Special Assistant Corporation Counsel (*Jan L. Rosker,* Special Assistant Corporation Counsel, with him) for the Board of Assessors of Boston.

*James S. Dittmar* (*Richard R. Lavin* with him) for the taxpayer.

FINE, J. The board of assessors of the city of Boston (city) appeals, pursuant to G. L. c. 58A, § 13, from a decision of the Appellate Tax Board (board), granting real estate tax abatements for five fiscal years, 1978 through 1982, to New Boston Garden Corporation (Garden) for property the Garden owns. The building complex, which includes the Boston Garden, an arena familiar as the home of the Boston Bruins and the Boston Celtics, and the North Station Terminal, and which is located at 80-120 Causeway Street in Boston, is the same property which was the subject of appeals to the Supreme Judicial Court from a decision of the board for the three and one-half fiscal years immediately preceding the years in question in this case. See *New Boston Garden Corp.* v. *Assessors of Boston,* 383 Mass. 456 (1981). The court in that opinion, at 457 and 460 described the property and, at 465 to 467, elaborated upon the substantial evidence test according to which a determination by the board of value of taxable estate is to be reviewed on appeal. See also *Fox Ridge Associates & Co.* v. *Assessors of Marshfield,* 392 Mass. 652, 653 (1984); *Assessors of Brookline* v. *Buehler,* 396 Mass. 520, 524 (1986).

After a hearing, the board made findings and rulings and ordered tax abatements for each of the years in question.[1] On

---

[1] The city had assessed the property for each of the years in question at $3,848,800, of which $1,069,800 was the assessed value of the land. The board found the fair cash value of the property to be $2,740,000 in fiscal

appeal the city contends that the board's decision should be reversed because of unfair procedural rulings and because in numerous respects its determination of value for each of the years in issue was not based upon substantial evidence. We find merit in only one of the city's contentions. That contention relates to the board's decision to exclude from the Garden's gross income certain income listed in the Garden's financial records as deriving from "Causeway Advertising." The decision to exclude the income had the effect of lowering the board's determination of value for each of the tax years.

*Procedural rulings.* The board in its decision relied heavily on the opinion of the Garden's expert appraiser, Martin Coleman. The city had had the opportunity to examine Coleman's written report during settlement negotiations prior to trial. Coleman's direct examination lasted an afternoon, an entire day, and another morning. The written report was admitted in evidence and marked as an exhibit on the final morning of Coleman's direct testimony. The city began cross-examination immediately after the luncheon recess. Counsel for the city had been furnished a copy of the report to use while the witness was being examined but was not permitted to remove it from the hearing room. Several times on the day the city began its cross-examination, counsel for the city requested permission to make a copy of the report to use outside the hearing room to prepare for the next day's cross-examination. Offering a number of different justifications for its rulings, the board denied each such request. In its final decision, the board justified the denial of the requests on the basis of its power to control material in evidence, the Garden's need for confidentiality, and, inasmuch as the city had the use of the report during the examination of Coleman and access to it during normal business hours in the clerk's office, the absence of prejudice to the city.

year 1978, $3,018,000 in 1979, $4,144,500 in 1980, $5,507,000 in 1981, and $5,793,327 in 1982. Because, according to a stipulation of the parties, in each of the years in issue the property was disproportionately assessed, see *Tregor* v. *Assessors of Boston,* 377 Mass. 602, cert. denied, 444 U.S. 841 (1979), abatements were ordered in the amounts of $818,141.62 for 1978, $802,393.03 for 1979, $497,987.37 for 1980, $504,374.76 for 1981, and $401,380.76 for 1982.

On appeal the city contends that the refusal to allow its attorney to copy the report[2] to use overnight to prepare for the cross-examination of Coleman prevented the city's attorney from conducting an effective cross-examination. We understand the frustration expressed by the city. Surely overnight access to a copy of the report would have advanced the search for truth and made the proceeding fairer. No substantial harm to the Garden was threatened. The information contained in the report had become public as soon as the document had been admitted in evidence. See G. L. c. 58A, § 8. Compare *Cowley* v. *Pulsifer,* 137 Mass. 392, 394 (1884). In this day and age, the right of access to a document generally includes the right to make a copy of it. See *Direct-Mail Serv., Inc.* v. *Registrar of Motor Vehicles,* 296 Mass. 353, 356 (1937). True, administrative agencies have broad discretion over procedural matters. See, e.g., *Assessors of Provincetown* v. *Vara-Sorrentino Realty Trust,* 369 Mass. 692, 694 (1976). However, it is difficult to conceive of any rational basis for the rulings of which the city complains.

The Garden attempts to justify the rulings on the basis of Rule 27 of the Rules of the Appellate Tax Board, which provides: "The originals of . . . exhibits introduced in evidence before the Board may be withdrawn from the custody of the Board in such manner and upon such terms as the Board in its discretion may provide." (See also G. L. c. 58A, § 13.) That rule, however, serves only purposes not relevant here: assuring the preservation of documents needed by the board to perform its function and protecting the interests of parties to proceedings before the board in maintaining control over their original documents. The Garden also relies upon the need, recognized by the board, to protect the confidentiality of its

---

[2] Given the present state of the law, it is unlikely that such a problem would arise today. General Laws, c. 58A, § 8A, as amended by St. 1986, c. 385, § 3, provides: "At least thirty days prior to the hearing of a petition for the abatement of a tax, upon a motion filed by either party and granted by the appellate tax board, the appellant and appellee shall exchange appraisal reports containing such information about the property as the appellate tax board adjudges necessary." The provision took effect on September 9, 1986, after the hearing in this case.

financial situation because of competition in the arena industry. Once the Garden had determined that it would use facts about its financial situation to seek tax abatements for the years in question, however, it could not reasonably expect that the information would be kept from taxpaying citizens with a legitimate interest in knowing the reasons underlying the award of abatements to a major taxpayer.

Nevertheless, the city has failed on appeal to demonstrate how the erroneous ruling caused it to be prejudiced. *Bendett* v. *Bendett,* 315 Mass. 59, 65 (1943). *Puffer* v. *Beverly,* 345 Mass. 396, 401-402 (1963). *Pina* v. *McGill Dev. Corp.,* 388 Mass. 159, 164 (1983). There was nothing in the report to which the city's attorney did not have access before trial and at various times during trial prior to the overnight recess. The report was lengthy, but much of it related to the deteriorated physical condition and design defects of the Garden and generalities about the arena business which were discussed at length in the testimony and reports of other witnesses. To the extent that the report included the Garden's financial data, that information had been provided to the city in the course of pretrial discovery. Although the rulings were erroneous, we are not persuaded that increased access to the few pages that constituted the heart of the report, the basis for Coleman's opinion of the Garden's market value, would have affected the substance of the cross-examination or the outcome of the case.

We have also reviewed the instances in which the city complains that its right of cross-examination was unreasonably restricted and find no abuse of discretion by the board or any demonstration of prejudice.[3] See *Commonwealth* v. *Caine,* 366

---

[3] On four occasions during its cross-examination of William Cunningham, the Garden's expert witness on arena management, the board instructed the city's attorney to move on to another issue. In each instance, however, the questioning on the issue had become prolonged and repetitious. See *Commonwealth* v. *Watson,* 377 Mass. 814, 837 (1979); *Commonwealth* v. *Dominico,* 1 Mass. App. Ct. 693, 714 (1974).

Counsel for the city was also not permitted to question Charles Sink, the Garden's expert on arena design, about the construction cost of the McNichols Arena, an arena located in Colorado which Sink designed. Since Sink

Mass. 366, 370 (1974); *Commonwealth* v. *Watson*, 377 Mass. 814, 837 (1979); *Commonwealth* v. *Dominico*, 1 Mass. App. Ct. 693, 714 (1974); *Cooke* v. *Walter Kidde & Co.*, 8 Mass. App. Ct. 902, 903-904 (1979). Compare *Ott* v. *Board of Registration in Medicine*, 276 Mass. 566, 574 (1931).

*Substantiality of the evidence supporting the board's determination of fair market value.* The board relied primarily upon the capitalization of income approach for determining the value of the real estate, as did both the Garden's expert, Coleman, and the city's expert, Francis G. McGee. The city in its appeal challenges certain of the board's determinations of the Garden's income and expenses, as well as the choice of a capitalization rate to be used to determine the property's fair cash value. Most of the city's contentions reduce to claims that the Garden's evidence or approach should have been rejected by the board. The question we must decide with respect to each of the contentions regarding the board's approach to determining value, however, is whether that approach is reasonable and supported by the record. See *Blakeley* v. *Assessors of Boston*, 391 Mass. 473, 477 (1984); *Assessors of Sandwich* v. *Commissioner of Revenue*, 393 Mass. 580, 586 (1984). As to the contested findings, the question is whether they are supported by substan-

---

testified about the McNichols Arena only to demonstrate by comparison the obsolescence and design deficiencies of the Garden, the board did not abuse its discretion in determining that the relevance of the proposed cross-examination of Sink was slight.

Counsel for the city was also not permitted to question Paul A. Mooney, president of both the Garden and the Bruins, regarding the identity of the stockholders of the Garden's parent corporation, Delaware North, Inc. When the board sustained objections to the questions on the ground that it was satisfied that there existed some corporate affiliation between the Garden and the Bruins and the identity of the stockholders was not relevant, the city gave no reason for its need to pursue the inquiry. The city argues on appeal that Mooney's answers would have established that, given the true nature of the corporate affiliation, the actual rents paid by the Bruins were the result of arms' length agreements, and the use of imputed rather than actual rents, therefore, was not proper. Since the city did not explain its theory to the board at the appropriate time, there was no reversible error. *Davey Bros., Inc.* v. *Stop & Shop, Inc.*, 351 Mass. 59, 63 (1966). *Commonwealth* v. *Cheek*, 374 Mass. 613, 615 (1978). *George* v. *Jordan Marsh Co.*, 2 Mass. App. Ct. 848, 849 (1974).

tial evidence being "such evidence as a reasonable mind might accept as adequate to support a conclusion." *New Boston Garden Corp.* v. *Assessors of Boston,* 383 Mass. at 466. With one exception, the city's contentions fail, either because there is substantial evidence in the record to support the board's conclusion or because the issue raised is one which the city is precluded from raising because the issue was not raised below. G. L. c. 58A, § 13. See *New Boston Garden Corp.* v. *Assessors of Boston,* 383 Mass. at 459; *Blakeley* v. *Assessors of Boston,* 391 Mass. at 476.

1. *Management fee.* The city urges us to reject the imputed management fee allowed by the board as an expense. At trial both Coleman and McGee took the position that the board should impute a market rate management fee in determining the Garden's annual expense for management of the real estate. The experts differed, however, as to the appropriate rate to apply to the income. The board allowed an imputed management fee at a rate higher than that suggested by McGee and slightly lower than that suggested by Coleman. On appeal the city argues for the first time that only actual expenses incurred by the Garden for management should have been allowed. The argument is based on the observation that expert testimony concerning management fees related to the experience of public arenas rather than privately owned arenas such as the Garden. We are precluded from considering that contention now because it was not even suggested to the board at trial. Moreover, even if we were to consider it, we would not conclude that the board erred. The board was not precluded from equating public and private arenas for these purposes. There was evidence that the duties of arena managers for public and private arenas are similar. The board's determination, therefore, was based upon substantial evidence.

2. *Co-promotion leases.* Similarly, the city does not prevail in its contention that the board erred in imputing rents on co-promotion leases. Although leases for most Garden events are standard real estate leases, on occasion the Garden enters into a co-promotion lease. Under such an arrangement, the Garden assumes responsibility for direct expenses of an event

for which it would not ordinarily be responsible, and, by doing so, it undertakes some risk of loss if the event is not profitable. The city contends that the board should have used the actual rent figures in connection with the co-promotion leases rather than imputed rents, which in most instances were lower than the actual rents. There was expert testimony, however, that in the arena industry promotion of an event is a different function from operation of the real estate, and income from promotion, thus, is logically distinguishable from income derived from the real estate. Both the Garden's expert and the city's expert took the position at trial that the rents for these events should be imputed rather than based upon actual receipts. The city cannot object for the first time on appeal to the board's method of determining income. Moreover, the evidence in the record distinguishing promotion from operation of real estate was substantial and justified the board's decision to impute rents for the co-promotion leases and to disregard actual receipts. See *Alstores Realty Corp.* v. *Assessors of Peabody,* 391 Mass. 60, 67-69 (1984).[4]

3. *Rents for Bruins events.* Similarly, the city has not shown that the board erred in imputing rents rather than using actual receipts for the Bruins events. The finding that there existed some corporate affiliation between the Garden and the owner of the Bruins was amply supported, and the objection to the use of imputed rather than actual figures is raised for the first time on appeal.

4. *Recapture rate.* The city makes a plausible argument that the board erroneously accepted the 7.5% recapture rate recommended by Coleman. Under the income capitalization approach to measuring the value of real estate, the first step is to determine net operating income by subtracting operating expenses from gross income from the real estate. Net operating income is then divided by a percentage determined to be the appropriate

---

[4] There is no evidence in the record to support the city's alternative contention that, if income attributable to co-promotion leases is to be imputed, it should be offset by some of the Garden's overhead expenses. The city does not show, and did not show at trial, what, if any, overhead expenses were attributable to the Garden's activities as a promoter.

capitalization rate. The figure arrived at as a result of that calculation is the value of the property. *General Elec. Co.* v. *Assessors of Lynn,* 393 Mass. 591, 609 (1984); *Assessors of Brookline* v. *Buehler,* 396 Mass. at 522-523. The over-all capitalization rate used by the board for the five years in question ranged between approximately 25% and 31%. Included as components of the capitalization rate for each year were percentages representing return on investment, a tax factor, and the recapture rate. The concept of including a recapture rate as a component of the over-all capitalization rate for the purpose of determining the Garden's value was approved in *New Boston Garden Corp.* v. *Assessors of Boston,* 383 Mass. at 473-475.

The use of a recapture rate is based on the assumption that a building has a determinable economic life and that a reasonable property owner would expect to recoup the value of the building over the course of its economic life. At the end of the term of the building's useful life, found by the board in this case on the basis of substantial evidence to have been ten years in 1978 (the first fiscal year in question), the Garden would be left with the land and an obsolete structure, which would have to be demolished. Coleman based his opinion that a 7.5% recapture rate was appropriate on the assumption that the building had a ten year economic life and that the residual value of the land, less the cost of demolition, would be 25% of the value of the property.[5] Coleman offered no justification for his selection of the 25% figure, however, other than the suggestion that a prudent investor might expect to recover that portion of his original investment from the property's residual value. He offered no separate opinion of the value of

---

[5] After the Supreme Judicial Court remanded to the board the matter of abatements for the years 1974-1977, *New Boston Garden Corp.* v. *Assessors of Boston,* 383 Mass. at 476, the board determined value for each year in question utilizing the capitalization of income approach. Based upon the testimony of David Carney, one of the Garden's expert witnesses, the board, without discussion, included in the capitalization rate a 7.5% recapture rate based upon "an economic life of ten years and a salvage and residual value of 25%." *New Boston Garden Corp.* v. *Assessors of Boston,* Nos. 80532, 80533, 84766, 90403, slip op. at 3 (App. Tax Bd. July 28, 1981).

the land during the tax years in question or as of the date of his testimony.[6] Such evidence would have shed some light on the likely value of the land ten years after the first of the tax years in question, 1978. Nor did he offer an opinion concerning the other essential figure in the equation, the expected cost of demolishing the structure. That cost, we assume, would be substantial.

The city argues that Coleman's opinion should not have been accepted by the board because it was not based on substantial evidence. Given the unique nature of the property and the obviously significant value of 88,642 square feet of land in downtown Boston, we agree that the expert's opinion leaves one in the dark as to any rational basis for it and, therefore, that it was unduly speculative. Because Coleman's opinion on the recapture rate was a significant factor in the board's ultimate determination of value, and because the opinion was not tied to evidence of land value or demolition costs, reliance by the board on that opinion was at least questionable.

The city may not prevail on the recapture rate issue on appeal, however, because it did not raise the issue, or even "hint" at it, below. G. L. c. 58A, § 13. See *Cacciatore* v. *State Tax Commn.*, 368 Mass. 149, 151 (1975); *New Bedford Gas & Edison Light Co.* v. *Assessors of Dartmouth,* 368 Mass. 745, 752 (1975). McGee, the city's expert witness, testified to an opinion of value based upon a capitalization rate used by the insurance industry for commercial property into which a recapture rate was built. Coleman's cross-examination was lengthy and detailed and covered other components of the capitalization rate as well as that aspect of the recapture rate which was based upon the useful life of the building. Cross-examination, however, did not touch upon Coleman's use of the 25% figure to represent the residual land value. Nor did the city's requests for rulings or its posttrial brief mention the

[6] In different context, the city's expert offered an opinion of a land value of over $2,000,000, based on comparable sales, but the evidence was struck from the record. In the absence of any other evidence of land value, the board could have used the assessed value for these purposes. See *General Elec. Co.* v. *Assessors of Lynn,* 393 Mass. at 598.

issue. We decline, therefore, to reverse the board's determinations of value on this ground.

5. *Causeway Advertising.* We come finally to the one meritorious point raised on appeal. It relates to the board's treatment of income derived, according to the Garden's financial statements, from "Causeway Advertising." As we have indicated, use of the capitalization of income approach required the board to make findings on the Garden's annual income and expenses related to the operation of the real estate and, on the basis of those findings, to determine net operating income. Coleman's testimony was based upon the Garden's actual financial records. Listed in the expense section of the Garden's profit and loss statements for its real estate activites, as an item of income offsetting expense for each fiscal year, is an entry for "Causeway Advertising." However, Coleman eliminated the Causeway Advertising items from his calculations. His elimination of those amounts had the effect of decreasing his opinion of net income and, thus, the value of the property for each of the years. He justified the adjustments by stating that the income entries for Causeway Advertising had "nothing to do with the real estate." When questioned about the items on cross-examination, he said, "I don't honestly understand its total function except the income that it produces is totally unrelated to what my job was, so I pushed it to one side and ignored it." He stated that a year or so previously he had satisfied himself that the item should be eliminated because, as he "vaguely remembered," it had something to do with program advertising. He went on to say, "I could be completely wrong, but whatever it is, it's not real estate," and he added that John Dionne, the Garden's controller, could answer the question. Dionne testified, but no inquiry was made of him about the Causeway Advertising income. Other receipts from advertising, attributable, according to Dionne, to announcements on the "scoreboard, the Zamboni, posters and billboard," were listed as income on the financial statements, and no question was raised by the Garden about the propriety of their inclusion for the purpose of determining net income from operation of the real estate.

The issue before us is whether the board's finding that the Causeway Advertising income should be disregarded was supported by substantial evidence in the record, see *New Boston Garden Corp.* v. *Assessors of Boston,* 383 Mass. at 472, not whether Coleman's opinion of value was infirm. If the validity of Coleman's opinion of value were the issue, in the absence of a motion to strike the opinion, the infirmity would affect only the weight to be given the opinion. See *Assessors of Lynnfield* v. *New England Oyster House, Inc.,* 362 Mass. 696, 702 (1972). The city's objection to the exclusion of the Causeway Advertising income, affecting the ultimate calculations of value in a very limited and easily ascertainable way, was not the occasion for a motion to strike the opinion. The board, not improperly, accepted Coleman's methodology as sound but applied it to the income and expenses the board itself found to be correct. The evidence on which it based those findings, except to the extent imputed amounts were used, consisted entirely of the Garden's own financial records, the reliability of which the city did not challenge. According to those records, the Causeway Advertising income should have been included. Coleman's testimony about that income was speculative and insufficient as a basis for the Board's excluding its consideration. See *Boston Edison Co.* v. *Assessors of Watertown,* 387 Mass. 298, 308 (1982). The Garden, which had the burden of proving its entitlement to a tax abatement, see *General Elec. Co.* v. *Assessors of Lynn,* 393 Mass. at 600, could, perhaps, have remedied the situation by having Dionne explain the particular activities which gave rise to the income designated on the financial statements as having been derived from Causeway Advertising and by having Dionne distinguish that advertising income from the other advertising income which was considered in determining net income. The Garden did not do so, leaving only Coleman's speculative evidence in the record on the point.

The issue was adequately raised before the board to permit review on appeal. Although it was not raised in the city's posttrial brief, it was the subject of persistent cross-examina-

tion. The board, thus, had more than a "hint" that it was a matter of concern to the city. Compare *New Bedford Gas & Edison Light Co.* v. *Assessors of Dartmouth,* 368 Mass. at 752. It is not an instance, therefore, in which the city was "so remiss that it should be held to have waived this argument and therefore be precluded from raising it on appeal." *Northeast Petroleum Corp.* v. *Commissioner of Rev.,* 395 Mass. 207, 213 (1985).

*Conclusion.* The decision of the board must be modified in one particular only: namely, to the extent that the calculations of value for each fiscal year were affected by the elimination of the income from Causeway Advertising. The case is remanded to the board for further proceedings in accordance with this opinion. Neither party is to have the costs of the appeal.

*So ordered.*