408                                81 Mass. App. Ct. 408 (2012)

Black Rock Golf Club, LLC *v*. Board of Assessors of Hingham.

## BLACK ROCK GOLF CLUB, LLC *vs*. BOARD OF ASSESSORS OF HINGHAM.

No. 10-P-688.

Suffolk. March 10, 2011. - March 9, 2012.

Present: BERRY, MEADE, & SIKORA, JJ.

*Taxation,* Real estate tax: abatement, value. *Value. Evidence,* Value.

Discussion of the standard of review applied to an appeal from a decision of the Appellate Tax Board denying a taxpayer's challenge to an allegedly excessive assessment. [413-414]

This court vacated a decision of the Appellate Tax Board adopting, for the purpose of municipal taxation, a capitalization or market rental method of valuing the real property of a golf course country club, where there was insufficient evidence that a fair market lease would calculate rent in the manner so proposed; and where there was a lack of comparability between the golf course properties surveyed and the golf course at issue. [414-417]

APPEAL from a decision of the Appellate Tax Board.

*Ellen M. Hutchinson* for board of assessors of Hingham.

*Robert E. Brooks* for the taxpayer.

SIKORA, J. In this appeal we must review the valuation of the real property of a golf course country club for the purpose of municipal taxation. The owner of the real property (club or club facilities) is Black Rock Golf Club, LLC (Black Rock). The board of assessors of the town of Hingham (assessors) valued the club at $20 million for fiscal year 2006 and at $18.6 million for fiscal year 2007.[1] Those values resulted in tax bills of $186,760 and $169,911, respectively. In both years Black Rock filed an application for abatement. The assessors denied both applications. Black Rock appealed to the Appellate Tax Board (board). See G. L. c. 58A, § 7; G. L. c. 59, §§ 64, 65. The

---

[1]The date of assessment for fiscal year 2006 was January 1, 2005; and for fiscal year 2007, it was January 1, 2006. Our subsequent references to "tax years" 2006 and 2007 mean the fiscal years in question.

board concluded that the assessors had overvalued the club, and granted abatements to Black Rock for both years. The assessors have timely appealed to this court. For the following reasons, we vacate the final decision of the board and remand the case for further proceedings.

*Background.* 1. *Description of the club.* The parties do not dispute the size and nature of the club's property or its membership arrangements. The real estate of the club encompasses approximately 175 acres allocated to an eighteen-hole golf course and practice areas, a four-level clubhouse, a recreation center, an outdoor pool, and five outdoor tennis courts, walkways, and parking lots. Developers completed the course during 2002 and the main buildings by close of 2003. A large-scale residential development adjoins the club. It employs the name Black Rock Condominiums but operates under separate ownership.[2]

The club is a private for-profit enterprise. Only members may use its facilities. It offers three categories of membership: full membership, single golf membership, and recreational membership. A full membership provides a family with access to all of the club's resources. A single golf membership furnishes access to the golf course for one person. A recreational membership entitles the holder to use all of the nongolf facilities. The club's by-laws authorize a maximum of 325 full golf memberships and twenty-five single golf memberships.

An incoming member must pay a one-time initiation fee. The fee is partially refundable. If a member resigns, the club will pay the resignee the refundable portion of the initiation fee after three new members join the club. No interest accrues on members' and resignees' refundable amounts because the club uses those amounts to support operations. During the two tax years in question, the initiation fee for a full membership was $125,000, of which $90,000 was refundable. Of the club's more than 300 members, only eighty-six had paid the $125,000 figure. Other members had paid initiation fees ranging from $65,000 to $115,000. Some

---

[2]The originators of the development contemplated joint ownership of the club property and the residential community. However, in 2004 the two developers swapped their partial ownership interests in the club and the residential property so that one took full ownership of the club and the other full ownership of the residential development. This appeal involves only the assessment of the club.

members had not paid any initiation fee but instead had received their memberships as an incentive to purchase a condominium in the residential development.

The operation of the club generated four categories of income: (1) golf revenue comprised of membership dues,[3] guest fees, cart rentals, tournament fees, and initiation fees; (2) clubhouse food and beverage sales; (3) merchandise sales; and (4) miscellaneous amenities and services.[4]

2. *Proceedings before the board.* In the board proceedings, both the assessors and Black Rock submitted detailed written appraisal reports and testimony by their respective experts: for the assessors, general certified real estate appraiser Emmet T. Logue; for Black Rock, general certified real estate appraiser Jeffrey R. Dugas. The assessors submitted a valuation based on a capitalization of income methodology. Black Rock submitted its valuation on a variation of a capitalization of income analysis and on a supplemental market study of the sale prices of five golf course country clubs.[5]

---

[3] Annual dues were a continuing obligation of members after payment of the one-time initiation fee.

[4] The board found the club's revenues by source in the following approximate amounts:

|                   | Tax year 2006 | Tax year 2007 |
| ----------------- | ------------- | ------------- |
| golf sources      | $4,608,000    | $4,885,000    |
| food and beverage | 2,000,000     | 2,000,000     |
| merchandise       | 325,000       | 325,000       |
| miscellaneous     | 478,100       | 495,000       |

The sources of "miscellaneous" revenue included pool and tennis fees, camps and clinics, babysitting services, and rentals.

[5] Massachusetts decisional law recognizes both capitalization of income and comparable sales studies as valid methods of real estate valuation. See, e.g., *Correia* v. *New Bedford Redev. Authy.*, 375 Mass. 360, 362 (1978).

Capitalization of income measures the value of property on the basis of its income-earning capacity. It typically employs two components: (1) the net income of the property (gross rental income minus operating expenses); and (2) a capitalization rate percentage representing the return necessary to attract investment capital. Division of the net operating income by the capitalization rate yields the proposed value of the property. Specific appraisals or assessments may add refinements to the basic computation. See, e.g., *General Elec. Co.* v. *Assessors of Lynn*, 393 Mass. 591, 609-610 (1984); *Assessors of Brookline* v. *Buehler*, 396 Mass. 520, 522-523 (1986).

Valuation by comparable sales data estimates the fair market value for the

a. *Assessors' valuation.* The assessors' expert employed a direct approach to income capitalization; he estimated the income earned by Black Rock as owner and operator of the club for the tax years in question and applied a capitalization rate to it. He estimated the club's gross revenue at $8,396,220 for 2006 and $8,940,489 for 2007. He further estimated the club's operating expenses at $5,781,571 for 2006 and $6,198,741 for 2007. He subtracted the operating expenses from the gross revenue and took a three percent deduction for reserves for replacements and a four percent deduction for "entrepreneurship return." He concluded that the club produced net income to be capitalized of $2,077,740 in 2006 and $2,171,780 in 2007. He then applied a capitalization rate of 10.42 percent to the 2006 net income and a rate of 10.40 percent to the 2007 net income. That computation (division of the percentage into the net income) produced a valuation of $19.9 million (rounded slightly downward) for 2006 and $20.9 million for 2007.

As one element of estimated income, the assessors imputed and included interest on members' initiation fees. Appraiser Logue characterized the fees as "non-interest bearing loan[s] to the [c]lub." To place a value on the assumed benefit of the free use of the initiation amounts, he calculated and added interest income on those amounts at the rate of the ten-year United States Treasury bills as of January, 2005, and January, 2006.

b. *Black Rock's valuation.* In contrast, Black Rock did not simply estimate the club's net income and apply a capitalization rate. Instead, its expert estimated the fair market rental income which Black Rock could have achieved if it had chosen to lease the club to a third-party management company, a common practice in the golf club industry. To determine the rental potential of the club for the tax years 2006 and 2007, appraiser Dugas analyzed the lease terms employed by a set of eleven other club owners and third-party managers. From that survey he concluded that a fair market lease would have based rent on certain percentages of the club's revenues from golf activity, food and

property at issue from the prices paid for reasonably similar real estate in transactions within a proximate time span. *Correia* v. *New Bedford Redev. Authy.*, *supra.* See *Anthony's Pier Four, Inc.* v. *HBC Assocs.*, 411 Mass. 451, 479-481 (1991).

beverage sales, merchandise sales, and miscellaneous receipts. From his sample he projected that Black Rock could have leased the club and received annual rent equal to the sum of twenty-two percent of golf revenue, ten percent of food and beverage sales, six percent of merchandise sales, and five percent of miscellaneous revenue. He applied those percentages to the revenue streams of the club and concluded that Black Rock could have achieved rent of $1,259,465 in 2005 and $1,330,356 in 2006, respectively, as determinants of the disputed assessments effective as of January 1, 2005, and January 1, 2006. He calculated a capitalization rate of 10.996 percent for the first year and 10.920 percent for the second year.[6] The application of those rates to the estimated rental income figures resulted in rounded valuations of $11.5 million for the first year and $12.2 million for the second year.

Black Rock supplemented its capitalization method with a market study of proposed comparable sales. Its survey contained the data of the sales of five clubs. Four were in Massachusetts, and one in Pennsylvania.[7] By this method, Black Rock's expert proposed a valuation of "$10,000,000 to $11,000,000."

c. *Board's decision.* As its main reasoning, the board adopted Black Rock's capitalization or market rental hypothesis. It referred glancingly to the comparable sales approach but did not employ it as an element of its decision. It made some slight adjustments. It increased the rental percentage for the golf revenue from twenty-two percent to twenty-five percent, and adopted the assessors' capitalization rates instead of Black Rock's. The higher rental rate for golf revenue and the reduced capitalization rate produced slightly higher valuations. After rounding, the board valued the club at $13.39 million as of January, 1, 2006, and at $14.09 million as of January 1, 2007.

---

[6] Both parties' experts placed capitalization rates within the range of 10.40 percent to 10.996 percent.

[7] The Ridge Club in Sandwich sold for $8.25 million in August, 2007; the Turner Hill Golf Club in Ipswich sold for $9 million in April, 2007; the Sterling Country Club in Sterling sold for $7.235 million in December, 2005; and the Ferncroft Country Club in Middleton sold for $13.15 million in December, 2005. The Hartefeld National Golf Course in Avondale, Pennsylvania, sold for $12 million in April, 2007.

The indicated prices reflect minor adjustments by the expert witness for additional cash concessions made by the buyers as part of the final sales transactions.

The board rejected the assessors' higher valuation for two main reasons. The board found the computation of imputed interest on initiation fees to be flawed because (1) that method assigned interest income to both refundable and nonrefundable portions of the fees; and (2) the assessors estimated the amount of received initiation fees on the faulty premise that all members had paid the maximum figure of $125,000, when in fact most members had paid considerably less and some none at all. The board concluded that the assessors' "calculation of imputed interest income was likely overstated and so inflated [the] estimates of value as to render them unreliable."

*Analysis.* 1. *Standard of review.* Municipal assessors carry "a statutory and constitutional obligation to assess all real property at full and fair cash value." *Coomey* v. *Assessors of Sandwich*, 367 Mass. 836, 837 (1975), citing Part II, c. 1, § 1, art. 4, of the Constitution of the Commonwealth; art. 10 of the Declaration of Rights; and G. L. c. 59, §§ 38, 52. A taxpayer may challenge an assessment as excessive by petition to the municipal assessors for an abatement. G. L. c. 59, § 59. If the assessors deny the abatement, the aggrieved taxpayer may appeal to the Appellate Tax Board. G. L. c. 59, §§ 64-65. The taxpayer may appeal from a final decision of the board to this court. G. L. c. 58A, § 13.

While G. L. c. 58A, § 13, as appearing in St. 1998, c. 485, § 2, authorizes only an appeal "as to matters of law," the accumulated decisions hold that the reviewing court will examine the board's adjudication for "a correct application of the law" and for a basis in "substantial evidence." *Mount Auburn Hosp.* v. *Assessors of Watertown*, 55 Mass. App. Ct. 611, 616 (2002). *Massachusetts Bay Lines, Inc.* v. *Commissioner of Rev.*, 72 Mass. App. Ct. 321, 325-326 (2008). "Substantial evidence is 'such evidence as a reasonable mind might accept as adequate to support a conclusion,' taking 'into account whatever in the record fairly detracts from its weight.' " *Assessors of Brookline* v. *Buehler*, 396 Mass. 520, 524 (1986), quoting from *New Boston Garden Corp.* v. *Assessors of Boston*, 383 Mass. 456, 466 (1981). The board's expertise is entitled to "some deference." *McCarthy* v. *Commissioner of Rev.*, 391 Mass. 630, 632 (1984). *Koch* v. *Commissioner of Rev.*, 416 Mass. 540, 555 (1993). As

appropriate, that deference will extend to "the board's judgment concerning the feasibility and fairness of alternate proposed methods of property valuation." *Massachusetts Inst. of Technology* v. *Assessors of Cambridge*, 422 Mass. 447, 452 (1996).

At the same time, "[a] reviewing court must set aside a finding of the board if 'the evidence points to no felt or appreciable probability of the conclusion or points to an overwhelming probability of the contrary.' " *Irving Saunders Trust* v. *Assessors of Boston*, 26 Mass. App. Ct. 838, 841 (1989), quoting from *New Boston Garden Corp.* v. *Assessors of Boston*, 383 Mass. at 466. The determination of substantial evidence has the character of a "matter of law." See *Olympia & York State St. Co.* v. *Assessors of Boston*, 428 Mass. 236, 240 (1998); *Information Servs., Inc.* v. *Commissioner of Rev.*, 48 Mass. App. Ct. 197, 198 (1999).

2. *Assessors' valuation.* On appeal, the assessors have not argued directly and specifically for the adoption of their methodology and resulting valuation by a detailed criticism of the board's rejection of it. See part 2.c., *supra.* If they do so implicitly by their extended attack on the board's general acceptance of Black Rock's competing valuation rationale, then on the record and briefing we view the board's identification of weaknesses in the assessor's methodology as valid. The board's rejection of the assessors' methodology has the support of substantial evidence. We turn, then, to an examination of the board's general acceptance (with adjustments) of Black Rock's valuation.

3. *Black Rock's market rental valuation.* The assessors attack Black Rock's market rental capitalization method in two phases. First, they contend that its expert did not furnish sufficient evidence that a fair market management lease would rest on the differing percentages of multiple revenue streams for golf activity, food and beverage, merchandise, and miscellaneous sources. Second, they argue that, even if such leases were common for golf club management, Black Rock's proposed application of the criteria to its club failed because its expert was relying on noncomparable golf course facilities for his rental percentages.[8] For the following reasons, we agree.

_____

[8]The assessors criticize the board's reasoning for its lack of a preliminary determination of the "highest and best use" of the real estate as an evidentiary

First, the expert did not adequately establish that a fair market lease would calculate rent on the basis of different fixed percentages of a club's four revenue streams. He offered that extrapolation. However, none of the eleven clubs considered by Black Rock's appraiser followed the model of a management rental rate based on discrete percentages of revenues from golf, food and beverage, merchandise, and miscellaneous sales.[9]

foundation for any valuation of the club's property. The board assumed that both the assessors and Black Rock began from the premise that the highest and best use of the property was "as a golf course/country club." However, the assessors' expert specifically opined "that the highest and best use of [the property] was its continued use as a *private* 18-hole golf course plus the existing Clubhouse, Recreation Center and associated site improvements, amenities and accessory buildings" (emphasis supplied). As our oncoming analysis indicates, the board appears to have treated public and private facilities interchangeably, even though their revenue-generating capacities require separate treatment.

[9]The eleven properties consisted of the following golf course facilities, described by name, location, public or private character, and management rental terms:

*Private Golf Courses*

(1) The Orchards, South Hadley: rental rate of flat first-year figure increased annually by fixed amounts; and

(2) Olde York Country Club, Columbus, New Jersey: rental rate of a first-year base amount increased annually in accordance with the consumer price index.

*Public Golf Courses*

(1) Sagamore Springs Golf Course, Lynnfield: rental rate of flat first-year figure increased annually by three percent;

(2) Beverly Golf and Tennis Club, Beverly: rental rate of flat first-year figure increased annually by set amounts;

(3) Franklin Park Golf Course, Dorchester: rental rate of fixed annual figures;

(4) Falmouth Country Club, Falmouth: rental rate of first-year base figure plus fixed amount for pro shop and food and beverage, all increased annually by three percent, and supplemented by a percentage of specified golf revenues above a set threshold;

(5) Kissena Park Golf Course, Queens, New York City: rental rate of first-year fixed figure with annual fixed increments or optional percentages of gross revenues increased at three-year intervals;

(6) Mill Pond Golf Course, Brookhaven, Long Island, New York: rental rate of an annual base amount supplemented by a percentage of all golf-related revenues;

(7) Bergen Point Golf Course, West Babylon, New York: rental rate of a

Five of the clubs maintained rent at fixed annual amounts;[10] three at annual base figures supplemented by percentages of revenues;[11] two at annual base figures with alternate revenue percentage amounts;[12] and one at a pure percentage of particular revenues.[13]

Further, if the surveyed leases did employ revenue percentages, that rental methodology would not likely apply to the Black Rock property. Of the eleven properties relied on by its appraiser, eight were public.[14] They generated golf revenue through daily greens fees. Their objective would be to maximize the number of rounds played. By contrast, as a private club, Black Rock would generate its main revenue from initiation fees and membership dues.[15] While Black Rock's appraiser treated initiation and dues revenues as golf-generated, they dif-

---

percentage of the average gross green fee revenue total for the prior two years plus a percentage of the gross food and beverage sales for that period; and

(8) Fairchild Wheeler Golf Course, Fairfield, Connecticut: rental rate of a set first-year base amount with prescribed annual incremental amounts or an optional percentage of annual golf revenues (twenty-six percent) and other revenues (five percent).

*Hybrid Public-Private Course*

(1) Currituck Club, Corolla, North Carolina: rental rate of a fixed annual minimum figure supplemented by percentages of gross revenues from golf, food and beverage, merchandise, and miscellaneous receipts. (The assessors maintain that the club is public, while Black Rock's expert described the club as private. It appears that the club is a hybrid of the two, but the record on appeal is unclear on this point.)

[10]The Orchards, Olde York Country Club, Sagamore Springs Golf Course, Beverly Golf and Tennis Club, and Franklin Park Golf Course.

[11]Falmouth Country Club, Mill Pond Golf Course, and the Currituck Club.

[12]Kissena Park Golf Course and Fairchild Wheeler Golf Course.

[13]Bergen Point Golf Course (discrete percentages for greens fees and food and beverage sales).

[14]Only two were private. One (Currituck) was apparently a hybrid public-private facility offering memberships and nonmembership daily fee arrangements. See note 9, *supra*.

[15]In calendar 2005 (the base period for the assessment effective on January 1, 2006), Black Rock's total gross revenue was $7,385,681. Of that amount, the golf-related revenue (inclusive of initiation fees and membership dues) amounted to $4,628,252, or 62.7 percent of gross revenue.

For calendar 2006 (the base period for the assessment effective on January 1, 2007), the corresponding amounts were $7,723,644 and $4,970,810, or 64.4 percent.

fer in kind from the user fees on which public courses rely for revenue. The board applied the market rental survey process to the club, but it did not explain the comparability of the relatively fixed annual income from Black Rock's system of prescribed initiation fees and dues, on the one side, and the public course facilities' variable revenues from greens fees and user fees, on the other.

Although the law permits the board to choose between reasonable alternative valuation methods, *Pepsi-Cola Bottling Co.* v. *Assessors of Boston*, 397 Mass. 447, 449 (1986), it nonetheless requires the board to assure the reasonableness of its choice by adequate findings and reasoning intelligible to the parties and the reviewing court. That requirement inheres in the standard of review for correct application of the law to fact finding supported by substantial evidence. In this instance, the lack of comparability between the surveyed eleven properties and the club subtracts from the value of the data submitted by Black Rock so as to bring their net weight below the level of substantial evidence. *New Boston Garden Corp.* v. *Assessors of Boston*, 383 Mass. at 466, and cases cited. Accordingly, we must vacate the decision of the board.

*Conclusion.* While the assessors have effectively challenged the board's adoption of Black Rock's methodology, they have not demonstrated the incorrectness of the board's rejection of their own income capitalization rationale. The case illustrates the difficulty of valuation of special purpose real estate. We remand it to the board for further proceedings in the nature of fact finding, reasoning, or both, in light of our analysis.[16] We deny Black Rock's request for the award of appellate attorney's fees; the assessors' appeal was not frivolous within the meaning of Mass.R.A.P. 25, as appearing in 376 Mass. 949 (1979).

The decision of the Appellate Tax Board is vacated, and the case is remanded to the board for further proceedings not inconsistent with this opinion.

*So ordered.*

[16]As the board did not address Black Rock's comparable sales theory (see note 7, *supra*) in its final decision, that methodology has not played a part in our consideration of the assessors' appeal.